**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

JUANITA GARCIA,

      Plaintiff,

v.                              No. 1:12-CV-00383-LH-RHS

THE CITY OF FARMINGTON,

      Defendant.

**DEFENDANT'S MEMORANDUM BRIEF IN SUPPORT OF**
**ITS MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S**
**TITLE VII GENDER DISCRIMINATION AND RETALIATION CLAIMS**

Defendant, the City of Farmington (the "City"), submit this brief in support of its Motion for Summary Judgment as to Plaintiff's claims of Title VII gender discrimination (failure to promote and hostile work environment) and retaliation. Importantly, this Court has already dismissed any retaliation claims "which occurred between the time [Plaintiff] engaged in her protected activity and filed her EEOC Charge in December 2010…" *See* Memorandum Opinion and Order, [Doc. 32], page 10. Therefore, any claims raised in Plaintiff's Count III Retaliation claim that occurred after December 14, 2010 and before Ms. Garcia engaged in protected conduct are barred.

As to Plaintiff's remaining claims, the undisputed facts established that Plaintiff was treated like every other trainee with regard to job duties, training and promotions. She was evaluated on the same objective measures applied to other employees. She suffered no adverse employment actions. Finally in response to her complaints, the City took reasonable action. Therefore, Plaintiff's claims fail as a matter of law. The City is entitled to summary judgment on

Plaintiff's claims of Title VII gender discrimination (failure to promote and hostile work environment) and retaliation.[1]

## LEGAL STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citing Fed. R. Civ. P. 56(e)). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. *Id.* at 249-50 (citations omitted). Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988). The court may consider only admissible evidence when ruling on a motion for summary judgment. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985) (citing Fed. R. Civ. P. 56(e)).

A defendant seeking summary judgment has an "initial burden to show that there is an absence of evidence to support the nonmoving party's case." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks omitted). Upon meeting that burden, the plaintiff must "identify specific facts that show the existence of a genuine issue of material fact." *Id.* "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the

---

[1] The City has contemporaneously filed motions for summary judgment on Plaintiff's remaining causes of action: breach of settlement agreement, and prima facie tort.

mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Biester v. Midwest Health Servs., Inc.*, 77 F.3d 1264, 1266 (10th Cir.1996).

I.      STATEMENT OF UNDISPUTED FACTS

The following undisputed material facts are supported by the evidence in this case and establish that Defendant is entitled to summary judgment:

**Operator Technician positions with the City of Farmington**

1.      In about 2008, significant money was invested by the City of Farmington in the Animas, power plant equipment to move towards a one-person operation. Rather than having a crew of operators, an operator is now expected to start up, shutdown and operate the power plant alone. *See* Michael Sims Depo, p. 75 ln. 8 - p. 77 ln. 24, attached as Exhibit A. The City of Farmington is bound by the Collective Bargaining Agreement ("CBA") it has entered into with the Local Union No. 611 of the International Brotherhood of Electrical workers. As part one of the Basic Principles of the Collective Bargaining Agreement, the City has agreed that "all persons hired for employment in the . . . Generation Division of the electric utilities system shall be required to meet the same skills and qualifications for a given job description as do members of the Union." *See* CBA, relevant portion attached as Exhibit B.

2.      Therefore, the change in the operations noted above was negotiated with the Union and is codified in the 2008-2012 CBA and the corresponding job descriptions for the operators. Sims Depo. p. 43 lns. 1-14. The operator positions include, in descending order of seniority:

        a.      Operations Technician II

      b.      Operations Technician I
      c.      Operations Technician Relief
      d.      Operations Technician Trainee II
      e.      Operations Technician Trainee I

The CBA documents de minimus requirements for the operations positions while the job descriptions maintained by the City's Human Resources department detail the requirements for each position.  *See* CBA Exhibit B.

3.      As indicated in the CBA and in the job description, in order to move up to the position of Operations Technician Trainee II, an Operations Technician I "shall  have two years' experience as an Operator Technician Trainee I and shall have passed the required written and skills tests for the positions."  *See* Operations Technician Trainee I and II Job Descriptions, attached hereto as Exhibits C & D respectively.

4.      To move into the Operations Technician I position a written exam and hands on skill assessment test is required.  Also , among other qualifications, the job description requires:

> Minimum of three (3) years combined cycle or co-generation experience (including combustion turbines) as a journeyman level Operations Technician or equivalent or a minimum of three (3) years' experience as a FEUS [Farmington Electric Utility Service] Operations Technician –Trainee is required.  Similar experience and/or training may be considered.

Operation Technician I Job Description, attached hereto as Exhibit E.

**Training for Operations Technician –Trainees I and II**

5.      Training for Operations Technician –Trainees consists of an informal on-the-job hands-on training process.  Operations Technician trainees spend three (3) years learning the job of an Operations Technician I.  This is learned by working alongside Operations Technician I and Relief Operators.  In addition, they are invited to participate with start-up and shut-downs of the power plants as those are scheduled.  Affidavit of Richard Miller, paragraph 5, attached hereto as Exhibit F.

6.     In addition, an Operations Technician-- Trainee I is given two (2) years to complete online GPI training course in order to sit for a written exam to move up to that Operations Technician-- Trainee II position.  Miller Affidavit Paragraph 7.

7.     Operations Technician-- Trainee II have an additional year to complete online GPI training course work and prepare for the written exam to test into the Operations Technician I position.  Miller Affidavit Paragraph 7.

8.     While Ms. Garcia has complained that she has not received adequate training, others have testified that her training has been the same as afforded to other trainees.  Mr. Click testified that he trained Ms. Garcia "exactly like all the other trainees . . ."  Click depo, p. 22 lns. 9-20, attached hereto as Exhibit G.  Moreover, Ms. Garcia has insisted that she should have been promoted ahead of time (*See* Complaint paragraph 25 [Doc 35]) contradicting her claim that she was inadequately trained. Garcia Depo. Vol I, p. 161 lns 20- p. 162 ln. 8, attached hereto as Exhibit H.

9.     According to Ms. Garcia, Damen Ben was a Trainee (hired six months after her) who was favored in the training he received.  Garcia Depo. Vol. I p. 143 lns. 10-20.  In fact, Mr. Ben failed the exam into the Operations Technician I position twice and was therefore terminated.  *Id.*  Lns. 21-24.

**Job Duties of Operations Technician Trainees**

10.     The job duties of Operations Technicians Trainees are varied and can include dirty work such as painting, cleaning the bathrooms, sweeping the facility and generally keeping the plant in good condition.  These duties are the same for all trainees and are also required of the more senior operators.  *See* Miller Affidavit, paragraph 4; and, Steve Warner Depo p. 141 lns. 22 to p. 15 ln. 9, attached as Exhibit I.

11.     Prior to and after Ms. Garcia complained of disparate job duty assignment, Mr. Miller sent reminders that job assignment expectations.  Affidavit of Michael Sims, paragraph 4, attached hereto as Exhibit J.

**Staffing the Operations Technicians positions**

12.     It is the practice of the City's Electric Utility to hold open a position when an employee is ready to test into a position rather than hiring from the outside. Sims Depo. p. 69 lns 10-13.  Due to anticipated retirements, more Operations Technician I would need to be hired to fill the needs of the City.  Therefore, the position was posted and recruitment efforts were made to hire additional Operations Technicians I.  *See* Letter from City Manager, attached as Exhibit K.

13.     The City Karen Reyes, a Hispanic woman into the Operations Technician I position in April 2012.   *See* Exhibit L.

14.     Ms. Garcia's allegation that Bryan Johnson was unqualified is readily belied by the fact that he was an Operations Technician I for a number of years before coming to work for the City.  Bryan Johnson Deposition, p. 5 ln. 18 to p 7 ln 13, attached hereto as Exhibit M. While he did not work for a power plant, part of his work involved electrical generation, and the same type of equipment and processes used in the City power plants making him eminently qualified to be a City Operations Technician I.  *Id.*

15.     Mr. John is the person whom Plaintiff alleged was permitted to see a written exam prior to taking the exam.  He testified that he never saw the written exam for the Operations Technician I or II positions prior to testing.  At best, he reviewed the test, *after* he took it to see the questions that he missed. Emmanuel John Depo p. 29 lns 12 to p. 30 ln 7, attached hereto as Exhibit N.

**Ms. Garcia's hiring and position advancements**

16.     On January 19, 2009, Ms. Garcia applied for a Operations Technician Trainee I position noting that although she had many years of experience, "the Operations Technician Trainee positions will be a natural place to start" because she will have to become familiar with the equipment.  *See* Cover Letter, attached as Exhibit O.   On April 1, 2009, Plaintiff was hired by the City as an Operations Technician Trainee I.

17.     Given her hire date of April 1, 2009, Plaintiff was able to test into the Operations Technician Trainee II position on or about April 2011.  She in fact tested, passed and was promoted into an Operations Technician Trainee II position.  Garcia Depo Vol I. p. 78 ln. 20 to p. 79, 12.

18.     Once she attained her third year anniversary on or about April 1, 2012, Ms. Garcia sat for the written exam for the Operations Technician I position and failed.  *See* Correspondence of April 5, 2012, attached hereto as Exhibit P.

19.     Six months later, in October 2012, Ms. Garcia again took the validated written exam.  This time she passed. She later did the skills assessment/ hands-on test and also passed. She was therefore moved into the Operations Technician I position retroactive to October 2012. She continues to hold that position to the present day.  *See* Candidate Assessment, attached hereto as Exhibit Q.

20.     Although she submitted applications on or about December 10, 2010 (job #120), January 4, 2011 (job #1), March 19, 2011, (job #43); May 2, 2011 (job #20) and January 16, 2012 (job # 9, #80 and "all openings") for Operations Technician I positions that were posted prior to April 1, 2012 (her three year anniversary with the City), Plaintiff did not have the requisite qualifications and therefore was not considered.  Many other applicants for those

positions with similar experience at a coal fired plant, were also rejected for lack of relevant experience.  Tom Swenk Depo p. 17 ln 35 to 24, attached as Exhibit R.  Specifically, Ms. Garcia did not have prior combine cycle gas turbine experience.[2]  Garcia Depo, p. 41 ln. 21 to p. 44 ln 19.   Moreover, her three years as a trainee had not passed.   Like Ms. Garcia, other applicants without experience were considered unqualified.  Swenk Depo p. 20 ln 1 to p. 21 ln. 17.

**Testing Policy**

21.     In March 2011, the City formally adopted a validated testing policy for the Electric Utility's testing process. *See* Hiring and Promotions Testing Process, attached as Exhibit S.

22.     The "Training Program Testing" provision of this policy applied to Ms. Garcia since she had participated in the operator trainee program.  Swenk Depo. p. 19 lns. 9 to 23. Under this policy, existing electric utility employees who participate in the training program for a given position must have a 70% composite score on the validated written test to pass.  This is weighted at 60% with the oral and practical interview weighted at 40%.  *See* Exhibit S.

**Remarks by Co-workers**

23.     Although often repeated by Ms. Garcia in her grievances and claims, she admits that the statement made by Bryson Akheah, "good morning you mother f—rs" was a one-time occurrence.  She complained and it did not happen again.  Garcia Depo Vol. I. p. 119 ln 3 to 16.

24.     Also with regard to Mr. Akheah, Ms. Garcia alleges that he once asked her to read a soda bottle labeled in Spanish because she was "Mexican."  Grantham-Richards Depo p. 54 ln 5 to p. 54 ln 16, attached hereto as Exhibit T.

25.     Mr. Click admits to once telling Ms. Garcia that she kept asking the "same stupid

---

[2] In fact, even with her prior employer's coal fired turbine power plant, she was demoted shortly before leaving their employment due to serious performance issues. *See* Garcia Depo Vol I. p. 11 ln. 6 to p. 72 ln. 25.

question". Click Depo p. 68 lns. 14 to 23. Mr. Click also once asked Ms. Garcia to stop wearing perfume. *Id*. at p. 39 ln. 13 to p. 41 ln. 23.

26.    Plaintiff alleges at paragraph 30 of her Complaint that she was called "a liar" and unqualified. This was said in the context of a disciplinary investigation involving whether Ms. Garcia "moved the load" while she was in the control room on or about January 18, 2011. Plaintiff's honesty was at issue because she was alone in the room and reports printed from the machinery reflected a manual move. Human Resources investigated the issue and concluded that contrary to what Ms. Garcia said, the load was manually moved and in the wrong direction. Hardin Depo p. 60 ln. 11 to p. 61 ln. 16, attached as Exhibit U.

27.    Ms. Garcia also alleges that her supervisor, Richard Miller, is hostile towards her because he monitors her time sheets for disciplinary reasons. *See* Amended Complaint ¶ 45. However, as her supervisor, he is required to supervise her time and also, notify her of any changes that need to be made. Miller Depo. p. 80 ln 1- p. 81 ln. 20 attached as Exhibit V. His notification of errors was not discipline. *Id.*

28.    Ms. Garcia cite as a retaliatory act the counseling she received on November 4, 2010 which noted that although the claim was not substantiated, if in fact she had pinched a male employee on the rear it would violate harassment policies. In response she filed a grievance. *See* Exhibit W.

**Complaints by Ms. Garcia were addressed**

29.    Ms. Garcia complained that the exterior door of the upstairs bathroom did not lock correctly. The interior stall had a working lock. Once the confusion about which bathroom she was referring to was sorted out, it was repaired. Sims Depo p. 144 lns 16 to p. 145 ln. 6.

30.    Ms. Garcia reported her claims of discrimination, retaliation and hostile work

environment to the City human resources department in June 15, 2010.  An investigation was done by the human resources director Donna Brooks and the Utility Director, Maude Grantham-Richards.   The investigation included a multitude of interviews and resulted in workplace training for all employees of the power plant.  *See* Investigation report, attached as Exhibit X.

31.     In addition, after the investigation, at least one employee, Bryson Akheah was disciplined. Brooks deposition.  Grantham-Richards Depo p. 68 ln. 23 to p. 70 ln. 4.

32.     Mandatory workplace diversity, sexual harassment, and retaliation training for all power plant personnel, including management took place in October 2010. *See* Correspondence of January 21, 2011 From Mayes to Fitzgerald, attached as Exhibit K.

33.     The City Manager, Robert Mayes, addressed a grievance filed by Ms. Garcia about the results of the investigation of her complaints and the failure to promote her.  *See* Ltr City Manager.  In that letter, the City's reiterates the substantial investment in the power plants and reasons that operators must have "gas combined cycle experience."  Namely, the need for one-person operation and upcoming retirements of experienced operators.  *See Id.*

34.     On December, 14, 2010, Ms. Garcia filed a Charge of Discrimination with the EEOC.  Attached as Exhibit Y.

## ARGUMENT

Plaintiff's complaint includes counts for Title VII gender discrimination (failure to promote and hostile work environment), retaliation, prima facie tort, and breach of settlement agreement.  In sum, Plaintiff alleges that because of her gender, she was subjected to a hostile work environment, retaliated against, and denied promotions.  The facts paint a different picture. The City did not treat Plaintiff any differently than any other trainee, and that is why she is disgruntled.  She wanted an exception to be made to the CBA and, the three year training period.

Instead she was required to be on the same track as any other trainee to gain the requisite experience to operate each of the power plants alone. And in fact, after completed those three years, she gained that knowledge and passed the tests, and she holds the Operations Technician I position.

There are legitimate non-discriminatory reasons why the requirements of the job she wanted are what they are. It includes the contractual obligations the City has to the Union. There is no evidence of pretext for discriminatory animus. None of the acts Plaintiff complains of rise to the level of severity or pervasiveness that must be present to sustain a claim of hostile work environment. Moreover, she suffered no adverse actions and thus no retaliation. The City is entitled to judgment in its favor.

## II.   PLAINTIFF'S FAILURE TO PROMOTE CLAIM FAILS AS A MATTER OF LAW.

Plaintiff's discrimination claims based on failure to obtain promotions cannot succeed. The claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Jones v. Okla. City Pub. Sch*, 617 F.3d 1273 (10th Cir. 2010). Under this framework, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802-04. To do so, a plaintiff must demonstrate that she is a member of a protected class, suffered an adverse employment action, and that the employer treated similarly situated employees differently. *Trujillo v. University of Colorado Health Sciences Center*, 157 F.3d 1211, 1214 (10th Cir. 1998). To establish a failure to promote claim, plaintiff must typically show that she (1) belongs to a minority group; (2) was qualified for the promotion; (3) sought but did not receive the promotion; and (4) the position was filled with a non-minority or remained available following the decision not to promote her. *Cuenca v. Univ. of Kan.*, 265 F. Supp.2d 1191, 1208 (D. Kan., 2003).

If successful, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the failure to promote.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-49 (2000). Once the employer articulates such a reason, the presumption of discrimination disappears and the plaintiff bears the burden of proving the employer's proffered reason is merely a pretext for discriminatory animus.  *McDonnell Douglas Corp.*, 411 U.S. at 802-04. At all times, the plaintiff retains the ultimate burden of proving she was illegally discriminated against. *Id.*

### a.   Plaintiff cannot set forth a prima facie case because she was not qualified for the Operations Technician I position.

Here, the undisputed material facts establish that Ms. Garcia cannot support the prima facie case for failure to promote.  While she is a member of a minority group and sought the Operations Technician I position, she was not qualified for the position.  As established by the objective qualifications for the position, Operations Technicians I must have experience with combined cycle or co-generation experience.  *See* Operations Technician I Job Description Exhibit E.  In the alternative, persons applying for the position may have three years' experience as a Farmington Electric Utility Service ("FEUS") Operations Technician Trainee.  *Id.*  When Ms. Garcia applied for and was not given the opportunity test for the Operations Technician I position prior to April 2012, she did not have these qualifications.  *See* Fact No. 20.  First, Ms. Garcia had not yet attained three years of experience as a trainee with the FEUS.  Secondly, she did not have combined cycle or co-generation experience.  Other applicants who did not have the requisite qualifications were similarly rejected. *Id.*

Plaintiff is claiming that as late as April 2012 she still had not been sufficiently trained (she alleges this was due to the fault of the City) and thus was not prepared to take the skills assessment component of the Operations Technician I test.  *See* fact No. 8.  Of course by then

she had participated in twenty start-ups.  *See* Exhibit 3 to Affidavit of Richard Miller.  This is relevant because even with three years under her belt, her on-line training completed, and participation in twenty start-ups, she did not feel she was ready to do the hands-on test.  These facts make Plaintiff's claims in this lawsuit that prior to April 2012, she should have been promoted because she was qualified, ring hollow.

Of the Operations Technicians I who were hired in the spring of 2012, one was a Hispanic female.  Thus, arguably one of the positions that Plaintiff was seeking was in fact filled by a minority, Karen Reyes.  In any case, Plaintiff is unable to establish that she had the requisite qualifications that enabled her to be qualified for the promotion she sought.  Therefore, she cannot set forth a prima facie case of discrimination based on failure to promote.

**b. The City has legitimate and non-discriminatory reasons for not prematurely promoting Plaintiff to the Operations Technician I position.**

Even assuming that Plaintiff is able to meet the prima facie case, the City of Farmington has legitimate nondiscriminatory reasons for refusing to promote Ms. Garcia into the Operations Technician I position.  The City of Farmington is bound by the Collective Bargaining Agreement it has entered into with the Local Union No. 611 of the International Brotherhood of Electrical workers.  As part one of the Basic Principles of the Collective Bargaining Agreement, the City has agreed that "all persons hired for employment in the . . . Generation Division of the electric utilities system shall be required to meet the same skills and qualifications for a given job description as do members of the Union."  *See* CBA, Exhibit B.  Thus, the Collective Bargaining Agreement does not permit room for the sort of exception that Ms. Garcia is requesting.  As a long time Union member and even Steward, Ms. Garcia should know this sort of exception would be a prohibited practice.

As indicated in the undisputed material facts at Nos. 2 & 3, the qualifications for Operations Technicians are further supplemented by the job descriptions for the positions. The job descriptions for the Operations Technician I position requires three years of experience with combined cycle or co-generation, or three years of experience in the Operations Technician training position with the City of Farmington.

The requirements found in the 2008 to 2012 Collective Bargaining Agreement and the job descriptions came about as a result of the shift in the manner in which the City operated the power plants. As explained by the City Manager letter of January 2011, the power plants represent a substantial investment meaning the City has an "obligation to manage risk for the economic impact and reliability of service to its customers should any of those facilities be damages due to inexperienced personal." Moreover, the move to one person operations meant that the power generation division would no longer have a crew of operators working at the power plant at the same time. Instead, the structure of the department would be such that the City would gradually move towards having one Operations Technician running any of the three given power plants alone. This meant that the training program and the requirements for each of the positions changed. The changes are reflected in the CBA signed effective July 2008. This change was underway well before Ms. Garcia ever became an employee of the City of Farmington. It is incongruous to attribute any discriminatory animas against Ms. Garcia to the changes in the departmental structure, the job description, training, or requirements for the Operations Technician I position.

The record shows these legitimate non-discriminatory qualifications for the Operations Technician I position were in place well before Ms. Garcia was hired and certainly well before the City had any expectation that she would seek a promotion sooner than she knew she was

qualified to do so.  Ms. Garcia claim for failure to promote fails as a matter of law and should be dismissed.

### III. PLAINTIFF CANNOT PREVAIL ON HER HOSTILE WORK ENVIRONMENT CLAIMS.

Plaintiff claims a hostile work environment based on her gender.  In order to establish such a claim, Plaintiff has the burden of demonstrating that the harassing conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir. 1996).  As discussed more fully below, Plaintiff cannot satisfy that burden.

Several of Plaintiff's hostile environment claims, like the comments by Mr. Akheah, are appropriately characterized as "stray remarks," that are insufficient to establish a hostile work environment.  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997) ("The plaintiff must demonstrate more than a few isolated incidents of prohibited conduct, such as a steady barrage of opprobrious comments based on ancestry or disability."); *Tomsic v. State Farm Mut. Aut. Ins. Co.*, 85 F.3d 1472, 1479 (10th Cir. 1996) ("stray remarks ... are insufficient to establish a jury question"; the Plaintiff must show a nexus between the allegedly discriminatory statements and the employer's adverse employment decision); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (affirming grant of summary judgment against hostile work environment claim; comments showing alleged discrimination amounted to "stray remarks" insufficient to establish discriminatory intent).

In any event, not every instance of bothersome or inappropriate behavior creates a hostile work environment that violates Title VII.  The standards developed by the Supreme Court for determining whether such an environment exists are not intended to become a "general civility

code," encompassing the ordinary tribulations of the workplace, such as the sporadic use of abusive language, jokes, and occasional teasing. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Further, "the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Instead, as the Tenth Circuit has explained:

> [F]or a hostile work environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

*O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999) (quotation marks, alteration, and citations omitted).

In order to distinguish innocuous and ordinary tribulations from the type of discriminatory conditions of employment that are actionable under Title VII, the Supreme Court has developed a two-part test. The first inquiry is whether the conduct at issue is "severe or pervasive enough to create an objectively hostile or abusive work environment— an environment that a reasonable person would find hostile or abusive." *Oncale*, 523 U.S. at 81 (internal citation and quotation marks omitted). "The severity and pervasiveness of the conduct must be judged from both an objective and a subjective perspective," and "[t]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *O'Shea*, 185 F.3d at 1097-98 (quotation marks and citation omitted). This may include "the social context in which the particular behavior occurs and is experienced by its target," and requires "[c]ommon sense, and an appropriate sensitivity to social context ... to distinguish between simple teasing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale*, 523 U.S. at 81-82. Thus,

the Court must assess the "real social impact of workplace behavior [based] on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 82.

The second inquiry asks whether the conduct at issue is "one that the victim in fact did perceive to be" hostile or abusive. *Faragher*, 524 U.S. at 787. "[T]he objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)). Careful consideration must be given to "the social context in which particular behavior occurs and is experienced by its target." *Id.* While "no single factor is required," courts and juries may take into account "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *accord Faragher*, 524 U.S. at 787. Stated otherwise, severity and pervasiveness are evaluated according to the totality of the circumstances presented. *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005).

The Tenth Circuit Court of Appeals has scrutinized many claims of hostile work environment, and has not hesitated to confirm the appropriateness of summary judgment in cases where, as here, the plaintiff cannot establish a hostile environment. Indeed, the Court recently noted, "Title VII's standard for redress is a hostile work environment, not an unpleasant one." *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 Fed. Appx. 914, 925-926 (10th Cir. 2009). Here, the stray remarks of which Plaintiff complains were neither pervasive nor severe, and thus are insufficient to establish an actionable claim for hostile work environment under Title VII.

Being greeted with "good morning you m-f-rs" is offensive.  It happened with Ms. Garcia present once.  She complained and it stopped.  That's how it should work.  Similarly isolated was the incident where she was told she kept asking the same stupid question.  It happened once. Assuming she was in fact yelled at when she was told to leave the control room after she moved the load (which she denied doing), this, too, would be the sort of isolated incident that cannot create a viable claim for hostile work environment.  *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (five incidents, occurring over the space of sixteen months did not create a hostile work environment); *see, also, Hervey v. County of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) (upholding summary judgment for an employer, when the plaintiff could not show that being criticized and yelled at by her bosses, while abusive, was because of her sex); *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 630 (8th Cir. 2005) (finding that "two years of frequent yelling" and other incidents were not sufficiently pervasive or severe to create a hostile working environment); *Bussell v. Motorola, Inc.*, 141 Fed App'x 819, 823 (11th Cir. 2005) (occasional yelling by a supervisor is not actionable harassment); *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) (however rude the yelling, swearing, and chastisement for unfinished work, rudeness or ostracism is not enough to support a hostile work environment claim);  *Soliz v. Assocs. in Med., P.A.*, 2007 U.S. Dist. LEXIS 60589 (S.D. Tex. Aug.17, 2007) (yelling at the plaintiff in front of other employees did not create a hostile work environment); *Heba v. New York State Div. of Parole*, 537 F. Supp.2d 457, 468 (E.D.N.Y. 2007) (even if employer's angry outbursts were "inappropriate," they did not "constitute an environment of pervasive hostility and abuse"); *Herawi v. State of Ala. Dep't of Forensic Scis.*, 311 F. Supp.2d 1335, 1351 (M.D. Ala. 2004) (yelling and other negative comments could not establish hostile work environment because such conduct was not sufficiently pervasive or severe); *Paape v. Wall Data, Inc*., 934 F.

Supp. 969, 977 (N.D. Ill. 1996) ("Title VII does not operate as a general ban on yelling, swearing, screaming and other rude or offensive behavior").

None of the acts that Plaintiff complains of rise to the level of severe or pervasive hostility and abuse. The facts establish that Plaintiff was assigned the same job duties as other trainees. Her training consisted of the same training available to other trainees. She was counseled and evaluated like other employees. Certainly a non-disciplinary email from a supervisor about corrections that need to be made to timesheets is not harassment that supports a hostile work environment claim. Further, Plaintiff has not presented any evidence that the alleged acts of hostility or abuse interfered with her work or altered the conditions of her work environment.

Moreover, the City responded in a reasonable manner to Ms. Garcia's complaints. Her claims were investigated. Diversity, sexual harassment and retaliation training was held for all power plant employees, including management. There is no evidence that the training conducted was an unreasonable response to the complaints raised by Ms. Garcia. Although Plaintiff was not satisfied by mandatory training, her complaints about acts of "harassment" after the training are simply repeat her previous complaints that she is not being promoted, trained, or that she is given unfair discipline.

The undisputed material facts establish that as a matter of law, Plaintiff cannot articulate any acts that rise to the level of severity or pervasiveness to support a hostile work environment claim.

## IV.    PLAINTIFF'S RETALIATION CLAIM ALSO FAILS

Since Plaintiff has no direct evidence to support her claim of retaliation, she must rely on circumstantial evidence alone. With regard to her retaliation claim, this Court has already

dismissed any retaliation claims to the extent they are based on events that occurred after December 14, 2010.  Plaintiff has pled "failure to promote" loosely in her retaliation count.  In fact, Plaintiff did not apply for any positions prior to December 14, 2010.  Thus, to the extent Plaintiff alleges that the failure to promote was retaliatory, that claim is barred by the Court's prior ruling.  *See* Memorandum Opinion and Order [Doc. 32].

When seeking to prove a claim of retaliation through circumstantial evidence, a plaintiff must establish a prima facie case of retaliation under the burden-shifting framework originally articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To establish a prima facie case of Title VII retaliation, Plaintiff must show that (1) she engaged in protected activity under the applicable act; (2) she subsequently suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action. *Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003). Plaintiff must also show that the defendant knew that the plaintiff engaged in protected activity.  *Anderson v. AOL, LLC*, 363 Fed. Appx. 581 *13 (10th Cir. 2010). Under the *McDonnell Douglas* framework, once the employee establishes a *prima facie* case of retaliation, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001). If the defendant successfully articulates such a reason, the employee must then demonstrate that the employer's proffered reason for the adverse action is pretextual. *Id.*

The United States Supreme Court has emphasized that "it is important to separate significant from trivial harms" and that the law does not "set forth a general civility code for the American workplace." *Burlington Northern*, 548 U.S. 53, 68 (2006) (citations and quotations omitted).  A claim of injury or harm, therefore, must rise to a requisite level of seriousness before

it can be considered materially adverse. *Id*. at 67-68.   "Conduct rises to the level of 'adverse employment action' when it 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"   *Stinnett v. Safeway, Inc*., 337 F.3d 1213, 1217 (10th Cir. 2003) (citations omitted); *Wheeler v. BNSF Ry. Co.*, 2011 U.S. App. LEXIS 6865 *17 (10th Cir. 2011). Decisions that have no material effect upon the terms and conditions of employment are not adverse employment actions.

In this case, Plaintiff did not suffer any adverse employment actions between the time she reported her complaints to human resources on June 15, 2010 and when she filed her Charge of Discrimination on December 14, 2010.   Allegedly unjustified disciplinary measures that have no material effect upon the terms and conditions of employment are not adverse employment actions. Though Plaintiff cites "unjust discipline" as a basis for her claim, even if true, such actions alone would not rise to the level of an "adverse employment action" since Plaintiff cites no material change in duties, status, pay or other terms or conditions of her employment. *See Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 408, 410, 413 (6th Cir. 1999).

Similarly, the written counseling Plaintiff received as a result of being reported for allegedly pinching a co-worked on the rear did not result in any adverse employment action.   The duties she was assigned to were the same as those assigned to other trainees.   None of the reprimands Plaintiff can cite to occurred prior to the filing of the Charge of Discrimination led to adverse actions. *See Weston v. Pennsylvania*, 251 F.3d 420 (3rd Cir. 2001); *see also Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000); *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc); *Young v. White*, 200 F. Supp. 2d 1259, 1277-79 (D. Kan. 2002).

Plaintiff continues to be employed with the City.  She has not suffered *any* actionable adverse action.  The same training opportunities were afforded to Ms. Garcia as were provided to all trainees.  Similarly, the job duties were the same for all trainees.  Notwithstanding, absent an adverse action, there can be no causal connection to any protected activity and therefore, Plaintiff cannot set forth a prima facie case of retaliation.  Summary judgment in favor of this City on this claim is appropriate.

## V.    CONCLUSION

For all the foregoing reasons, Plaintiff's claims of Title VII gender discrimination (failure to promote and hostile work environment) and retaliation claims fail.  Defendant respectfully requests that the Court enter judgment in its favor as Plaintiff's claims and for such other and further relief as the Court deems just and proper.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By:  */s/ Lorena Olmos*
    Brian Nichols
    Lorena Olmos
    Attorneys for Defendant
    Post Office Box 2168
    Bank of America Centre
    500 Fourth Street NW, Suite 1000
    Albuquerque, New Mexico  87103-2168
    Telephone: 505.848.1800

WE HEREBY CERTIFY that a true and correct copy
of the foregoing pleading was emailed to all counsel
of record this   14th day of November, 2013.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By:  */s/ Lorena Olmos*
    Lorena Olmos
K:\dox\client\32208\192\W2007173.DOCX