Page 21

1   Q. And Damon Ben was eventually hired into that
2   Ops Tech I position, right?
3   A. That's correct.
4   Q. And is he still employed with the City?
5   A. No, he is not.
6   Q. Do you know why he's not employed?
7   A. He failed the second attempt at his Ops
8   Tech I test, written test.
9   Q. So did Damon Ben ever have the position
10  title Ops Tech I?
11  A. No.
12  Q. And did you fire Ben?
13  A. Yes.
14  Q. And you fired him in accordance with the
15  policy that says that you have two shots at passing that
16  test; if you don't pass it you're not going to remain
17  employed, right?
18  A. That's correct.
19  Q. And when we say "two shots and you're not
20  going to remain employed unless you pass," we're talking
21  about the Ops Tech I position, right?
22  A. In this case it was the Ops Tech I position,
23  yes.
24  Q. Now, just with regards to that Ops Tech I
25  position, I'm going to get back to it later but I've got

Page 22

1   it rattling around now. Did anyone else interview for
2   that position that Ms. Garcia was hired into other than
3   Ms. Garcia and Damon Ben?
4   A. We had certain Ops Tech I positions open at
5   different times.
6   Q. Uh-huh.
7   A. But the one that Damon Ben was testing for
8   was an open position that no one was interviewing for.
9       MR. MOZES: Could you read that last answer
10  back, Jeannine?
11      (Requested portion was read.)
12  A. I can expound on that if you would like.
13  Q. (BY MR. MOZES) Yeah, if you would.
14  A. Okay. Usually what we try to do not just
15  with Operations Technician jobs but throughout the
16  electric utility is, for instance, we have an
17  apprenticeship program on the line department side. Is
18  that if we have someone who is fixing to what's currently
19  referred to as "break out" or in the case of an
20  operations trainee who is getting ready to test out and
21  we have a position open, we will -- we will typically
22  keep that position open so that that person can, if he's
23  successful in testing out, assume that position.
24      It would be counter-productive for us to
25  fill a position when someone is getting ready to test out

Page 23

1   of it and then have that person have to wait for an
2   undetermined period of time before he can move into an
3   open position.
4       And so we had an open position for Operator
5   Technician I. My recollection is that we had one for
6   Operations Technician I. And typically we would hold
7   that open for the person who's getting ready to test out
8   of it.
9       Now, if we don't have that position, the
10  person who tests out then becomes eligible for the next
11  one. And that happens at times, not -- it happens in the
12  line department quite often. Someone -- it's time for
13  them to break out and they test out and they are eligible
14  to take the next journeyman level position that comes
15  open without any kind of an interview process. So that's
16  typically how we would do that.
17  Q. Or you could say, "Hey, listen. You know
18  what? We don't have any qualified candidates for this
19  open Ops Tech position so we're going to wait a while and
20  repost it," right? You could do that too, right?
21  A. If we didn't have a qualified applicant or
22  we didn't have someone who was getting ready to test out,
23  we would definitely repost it.
24  Q. Okay. Okay. Let me hand you -- it's
25  already been marked so I'm not going to remark it. It's

Page 24

1   the Ops Tech Trainee I position. Let me just hand that
2   to you sir, so you can have a look at it while I'm asking
3   you questions about it. Now, just with regards to that
4   job description, did you write this job description?
5   A. I had a hand in writing this job
6   description.
7   Q. Who else had a hand in writing it?
8   A. I don't remember if -- if it was Dale Dirk
9   or if it was Richard Miller. Because it's right around
10  the date I believe that we had that transition. But I
11  believe for the most part if I had to -- I probably wrote
12  most of this and their job would probably have been just
13  to verify.
14  Q. And you will see it has a line there for
15  Personnel review but nobody signed off on it. Do you
16  know why that is?
17  A. No, I don't.
18  Q. Did you ever pass it by Personnel for
19  review?
20  A. Yes.
21  Q. You're sure?
22  A. Well, they are -- this actually is in
23  Personnel's job description file. So it was, you know,
24  sent up there. I don't know why it wasn't signed. It
25  may have been during the transition. I'm not sure.

Page 43

1  A.  When we negotiated the current system with
2  the union in 2008 it was clear to both parties that we
3  wanted a three-year program.  In fact, some of the
4  language is built into the CBA.  And that three-year
5  program would include two years of an Operations
6  Technician I, and one year as an Operations Technician II
7  before that individual would be eligible to -- I'm sorry.
8  Let me back up.
9       Operations Technician Trainee I, one year as
10 an Operations Technician Trainee II before that person
11 would be eligible to test for Operations Technician I.
12 And so from the very beginning it was always a three-year
13 program.  It was meant to be a three-year program.  And
14 these job descriptions are meant to reflect that.
15      Q.  Yeah.  I have no doubt that that's true.  I
16 think that just looking at them, you know, I think that's
17 a fair conclusion.  But my question was, what was the
18 purpose of requiring someone who has 20-plus years in the
19 power plant to go through that three-year program?  What
20 was your thinking on that?
21      MS. OLMOS:  Object to the form of the
22 question.
23      A.  The person was hired into that position.  If
24 the person was in that position in order to advance
25 through the program they would have to meet the

Page 44

1  requirements of that position.  If they were qualified to
2  get on any job within the City, whether it was an
3  Operations Technician or any other job, they certainly
4  could.  But if they weren't qualified then they had to
5  stay within this program until they were.
6       Q.  (BY MR. MOZES) Okay.
7       THE REPORTER:  May I have five minutes?
8       MS. OLMOS:  I was going to ask too.
9       MR. MOZES:  I don't pay attention to time.
10 Sure.  Let's take five minutes.
11      (Break from 9:01 to 9:10.)
12      (Marked Sims Exhibit No. 1.)
13      Q.  (BY MR. MOZES) We're back on the record
14 Mr. Sims.  Let me hand you what I've marked as Exhibit
15 No. 1 to your deposition.
16      A.  Okay.
17      Q.  Now, what I've handed you as Exhibit No. 1
18 to your deposition of Ops Tech I job description for the
19 City of Farmington; is that right?
20      A.  This is a version of a job description.  I'm
21 not certain this is the most current version of the job
22 description.
23      Q.  Yeah, I'm not either.  But the latest review
24 date says 7/09, right?
25      A.  Yes.

11 (Pages 41 to 44)

Page 75

1  this stuff is done and then -- and then you get -- you're
2  given opportunities to do it."
3       Absolutely.  If I had information to the
4  contrary that I believed was credible, I certainly would
5  have done that.
6       Q.  Yeah.  Because see, with regards to that
7  quote, your language of multiple witnesses, see my
8  understanding was based your testimony, the only one you
9  talked to about that was Richard Miller.
10      A.  Well, but he told me, right?
11      Q.  Right.
12      (Marked Sims Exhibit No. 8.)
13      Q.  (BY MR. MOZES) Let me hand you what I'm
14 going to mark as Exhibit No. 8.
15      A.  Okay.
16      Q.  I want to first look at No. 2, Paragraph
17 No. 2 where it says, "Specific language in the Agreement
18 prevents management from accelerating advancement for
19 Operations Technician Trainee I position and could only
20 be changed through Mutual Agreement which the City is not
21 inclined to do in this instance."  Now, I'm interested in
22 knowing with regards to that sentence and the City not
23 being inclined to accelerate advancement.  Prior to
24 October 7, 2010, had you talked to anybody about that?
25      A.  Prior to --

Page 76

1       Q.  You writing this memo.
2       A.  I don't recall if I had or not.
3       Q.  So it's entirely possible that when you
4  write here that the City is not inclined to do this in
5  this instance, that that was your decision, right?
6       A.  Yes.  I'm speaking on behalf of the City.
7  That was my decision.
8       Q.  Correct.  And you write, "The move to
9  one-person crews at Animas Plant necessitated a change
10 from the past practice of early promotion into a
11 two-person crew."  Can you explain that for me.
12      A.  Yes.
13      Q.  Okay.
14      A.  Prior to moving to a one-man operation which
15 we negotiated with the union in 2008, at Animas we had
16 two-man operation crew.  There was a Senior Operator who
17 was the foreman as you would, of the crew.  There was a
18 Turbine Operator who was of a journeyman level, control
19 operator, and then we had Utility Workers who were in
20 essence the trainees.
21      Given a two-person operations crew, we had
22 more leverage or more leeway in early promotion of
23 someone into the journeyman level position because we
24 always had someone, a more senior person, who could guide
25 and direct that person.

19 (Pages 73 to 76)

Page 77

```
 1        And so there were times when we had some
 2   what I would say exceptional Utility Workers who had
 3   advanced through the training to the point where we
 4   thought they could with some assistance occupy the
 5   Turbine Operator position, especially since there was a
 6   lead foreman-type position over them that could direct
 7   their activities, that we did do some acceleration at
 8   times.
 9        We changed that when we decided to go to
10   one-man operation, because we did not have that luxury
11   anymore. We didn't have the luxury of someone being able
12   to direct the activities of the person on shift since
13   they would be tasked with operating the plant by
14   themselves, all aspects of operating the plant, shutdown,
15   startup, by themselves.
16        And we actually invested a lot of money into
17   the plant to upgrade the plant so that that transition
18   could happen. Spent almost a million dollars in upgrades
19   at Animas plant to allow for that one-man operation. But
20   prior to that we did have the luxury of some early
21   accelerated promotion. We realized and that's why we
22   negotiated the contract, the CBA that basically is still
23   in effect associated with those parameters, for a one-man
24   operation.
25        Q. Paragraph 1 he wrote, "The utility has
```

Page 78

```
 1   scheduled diversity training for all generation personnel
 2   to reinforce the City's position regarding discrimination
 3   and harassment." Now, that was done in response to
 4   Ms. Garcia's claims, right?
 5        A. That's correct.
 6        Q. Now, do you know whether the mere act of
 7   conducting the diversity training in any way took care of
 8   the problems that Ms. Garcia had complained about with
 9   regards to discrimination and harassment?
10        A. I have no way of knowing whether there were
11   problems -- actual problems.
12        Q. Well, didn't she continue to make complaints
13   after diversity training took place?
14        A. I believe she did.
15        (Marked Sims Exhibit No. 9.)
16        Q. (BY MR. MOZES) Let me hand you what I'm
17   going to mark as Exhibit No. 9 to your deposition.
18        MR. MOZES: When we're done with this
19   exhibit we'll take a break.
20        MS. OLMOS: Okay.
21        Q. (BY MR. MOZES) Now, this is just kind of a
22   grab bag of Miller memos to file that were provided to me
23   by the City. They run from 2009 up through 2010. And
24   they regard different issues that Mr. Miller annotated in
25   these memos related to Ms. Garcia and complaints he had
```

Page 79

```
 1   received.
 2        A. Uh-huh.
 3        Q. And at -- and let's just look at the second
 4   page. And of course, this is -- this is all in the
 5   context of, "Do we keep Ms. Garcia or do we get rid of
 6   her," right?
 7        MS. OLMOS: Object to the form of the
 8   question.
 9        A. I'm not sure what context Richard had in
10   mind when he was putting this summary together.
11        Q. (BY MR. MOZES) Well, let's look at the
12   context you gave it. It's on the first page. Right
13   there in the middle of the page --
14        A. Right.
15        Q. -- 9/17/09. "Maude, it is time for Juanita
16   Garcia's second quarterly probationary review. These are
17   the comments I just received from Richard concerning
18   Juanita. This is a tough one."
19        A. Uh-huh.
20        Q. And she then sets forth some of her
21   concerns. I want to go back to the second page though.
22        A. Okay.
23        Q. Would you agree with -- how many years of
24   supervisory experience do you have?
25        A. I can tell you exactly. From 1985 to 1989,
```

Page 80

```
 1   so there's four.
 2        Q. Uh-huh.
 3        A. From 1999 until present day. That would be
 4   14. So 18 years.
 5        Q. Okay. Now, in your 18 years of supervisory
 6   experience would you agree with me just because an
 7   employee or employees come and make critical or negative
 8   reports about another employee doesn't mean it's true,
 9   does it?
10        A. That's true.
11        Q. I mean, one of the duties and
12   responsibilities of an adequate supervisor -- I'm not
13   going to say good -- of an adequate supervisor is if they
14   are receiving employee complaints about another employee
15   in the workplace, that's something they need to run down
16   to the ground, right?
17        A. Exactly.
18        Q. Now, if you will go to 254. It's this
19   perfume issue that Lorena had talked about shortly
20   yesterday. Do you agree with Mr. Miller's conclusion
21   here right at the bottom that if, if Ms. Garcia continues
22   to wear perfume and it's uncomfortable for anyone I'll
23   call her into my office and tell her to stop wearing it?
24        A. Absolutely.
25        Q. And what would be the basis for you giving
```

PAUL BACA PROFESSIONAL COURT REPORTERS