Page 79

1   A.   That is right.
2   Q.   And you refused to sign off, right?
3   A.   That is correct.
4   Q.   Why?
5   A.   Because I didn't see any need for me to sign
6   this.
7   Q.   Well, you knew that Ms. Garcia had a right
8   to utilize the informal grievance process. You knew
9   that, right?
10  A.   Sure.
11  Q.   And did you -- did you think that as her
12  supervisor that you had the right to refuse to sign off
13  that you had --
14  A.   Yes, I have the right to refuse to sign any
15  document presented to me.
16  Q.   Who told you that?
17  A.   Nobody told me that.
18  Q.   There's no policy in the City of Farmington
19  that gives you that right, is there? I mean, there's not
20  any policy that gives you that right, is there, sir?
21  A.   No.
22  Q.   Now, have you read the first paragraph
23  carefully?
24  A.   Not carefully but I know the -- I know what
25  it's about.

Page 80

1   Q.   All right. Is there anything, anything in
2   that paragraph that you believe is factually incorrect as
3   you sit there today?
4   A.   Yes. First thing I see is "reprimanding
5   me." I was not reprimanding Juanita.
6   Q.   Okay.
7   A.   The statement that, "This memo is another
8   form of harassment," I don't agree with that.
9   Q.   Okay.
10  A.   And the statement that it is done in
11  retaliation for comments that she made about not being
12  scheduled, I don't agree with that. I don't agree that
13  it was an attempt to disparately treat her and discredit
14  her service.
15       I don't agree with the statement that this
16  treatment has continued and that it is an example of how
17  she's treated differently and discriminated against. I
18  do not agree with that. And I disagree with the
19  statement that I continued to harass Ms. Garcia and
20  retaliate against her.
21       And I don't believe that I was in violation
22  of the CBA or any other law and I don't know anything
23  about the HR Department being previously notified. And
24  that's all I have to say about that.
25  Q.   When you sent her that e-mail what did you

Page 81

1   say to her?
2   A.   I don't remember exactly what I said to her.
3   Q.   But you're absolutely sure,
4   hands-in-the-fire sure that it was not in the form of a
5   reprimand, right?
6   A.   I am to the best of my recollection, no. It
7   was not a reprimand.
8   Q.   You don't know what it says but to the best
9   of your recollection it wasn't a reprimand, right?
10  A.   That is correct. That was not the intent of
11  that e-mail.
12  Q.   What was the intent of the e-mail?
13  A.   To help Juanita get her timekeeping correct.
14  Q.   Why couldn't you have just talked to her
15  about it?
16  A.   I don't know what the circumstances were.
17  Q.   All right.
18  A.   Possibly she was on graveyard shift and I
19  couldn't talk to her in person. I can't say for sure. I
20  do not know why.
21       (Marked Miller Exhibit No. 19.)
22  Q.   (BY MR. MOZES) Let me show you Exhibit
23  No. 19.
24  A.   Okay.
25  Q.   Now, Exhibit No. 19 you'll see is a document

Page 82

1   related to an incident involving you, sir. Have you ever
2   seen this document before?
3   A.   I -- I don't believe I have, no.
4   Q.   Did you say "no"?
5   A.   That is correct.
6   Q.   And but you were aware of this, right?
7   A.   Yes.
8   Q.   And were you aware of it through Juanita?
9   A.   Yes.
10  Q.   And she had a conversation with you about
11  her view of what changing her work schedule, the effect
12  that it had on her, right?
13  A.   Yes.
14  Q.   And let's just go through this. Did you
15  indeed change Ms. Garcia's work schedule in mid March of
16  2012 and move her from her normal day off?
17  A.   I did.
18  Q.   What was the reason you did that?
19  A.   To avoid paying overtime.
20  Q.   Okay. We're just going to go through this
21  here. And you agree that the work week there at the
22  Generation Division began on Sunday and ended on
23  Saturday, right?
24  A.   Yes.
25  Q.   And is it true that Ms. Garcia had been