## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JUANITA GARCIA,

       Plaintiff,

    -vs-                                        No. Civ. 12-0383 LH/SCY

THE CITY OF FARMINGTON,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment on Plaintiff's Breach of Settlement Agreement Claim (ECF No. 50), Defendant's Motion for Summary Judgment on Plaintiff's Claim of Prima Facie Tort (ECF No. 52), and Defendant's Motion for Summary Judgment on Plaintiff's Title VII Gender Discrimination and Retaliation Claims (ECF No. 54), all filed November 14, 2013.  The Court, having reviewed the Motions, the accompanying memoranda, and the applicable law, and otherwise being fully advised, finds that the Motion for Summary Judgment on Plaintiff's Breach of Settlement Agreement Claim ("Motion #1") is not well taken and will be **denied**; Defendant's Motion for Summary Judgment on Plaintiff's Claim of Prima Facie Tort ("Motion #2") is well taken and will be **granted**; and Defendant's Motion for Summary Judgment on Plaintiff's Title VII Gender Discrimination and Retaliation Claims ("Motion #3") is well taken in part and will be **granted in part** and **denied in part**.

# I.  PROCEDURAL BACKGROUND

Plaintiff Juanita Garcia brought this action on April 12, 2012, filing her Complaint for Damages from Title VII Gender Discrimination, Retaliation and Prima Facie Tort ("Complaint") (ECF No. 1).  On May 7, 2013, the Court entered its Memorandum Opinion and Order (ECF No. 32) denying Defendant's Memorandum Motion to Dismiss Plaintiff's Sex Discrimination and Retaliation Claims (ECF No. 12).[1]  Plaintiff subsequently filed her First Amended Complaint for Damages from Title VII Gender Discrimination, Retaliation, Breach of Settlement Agreement, and Prima Facie Tort ("Amended Complaint") (ECF No. 35) on May 9, 2013.  She brings six claims against Defendant, the City of Farmington ("City" or "Farmington"): Counts I and II, gender discrimination in failure to promote and hostile work environment, respectively, in violation of Title VII; Counts III and IV, retaliation and retaliatory hostile work environment, respectively, in violation of Title VII; and Counts V and VI, Prima Facie Tort and Breach of Settlement Agreement, respectively, under New Mexico common law.  Now before the Court are Farmington's three aforementioned motions for summary judgment.

# II  FACTUAL BACKGROUND

On January 19, 2009, Ms. Garcia applied for an Operations Technician-Trainee I position with the Farmington Electric Utility System ("FEUS").  Def.'s Mem. Br. Supp. Mot. #3 ("Def.'s

---

1    Although the Court did not grant Defendant's Motion, finding that Plaintiff had exhausted her administrative remedies for her retaliation claims in Count III of her Complaint and her hostile work environment claims in Counts II and IV, it did limit the scope of the retaliation claims to those allegations which occurred prior to the filing of her EEOC Charge in December 2010 – "failing to promote, giving her different assignments and testing opportunities from those given to her male co-workers[,] and subjecting her to harassment."  Mem. Op. and Order at 9-10.

Mem. #3")[2] (ECF No. 55) at 7 ¶ 16, Ex. O.   At that time, the City was bound by the "Agreement," a collective bargaining agreement ("CBA") it entered with Local Union No. 611 of the International Brotherhood of Electrical Workers ("Union" or "IBEW"), covering the period from July 1, 2008, to June 30, 2012. *Id.* at 3 ¶ 1, Ex. B.  Pursuant to the CBA, the City and the Union agreed "that all persons hired for employment in the . . . Electric Utility System shall be required to meet the same skills and qualifications for a given job description as do members of the Union."  *Id.* Ex. B at 5, Article II – Basic Principles, Section 1.  The CBA also listed "classification descriptions," which contained "less than minimal requirements" and were "not subject to change outside the Agreement," with "complete job descriptions . . . located in the City's Human Resources Department."  *Id.* Ex. B at 27, Rule 7.   These classification descriptions included:

> OPERATIONS TECHNICIAN I:  Shall be a qualified Journeyman operator designated as such for the rotating shift and is skilled in the operation of steam turbine generating equipment and switchboard equipment.  Shall have satisfactorily passed the required written and skills tests for the position.
>
> . . . .
>
> OPERATIONS TECHNICIAN TRAINEE II:  An employee skilled in Power Plant industrial process operations.  Shall have successfully completed a two year accredited operator training program or equivalent industry recognized program. Shall have two years experience as an Operator Technician Trainee I and shall have passed the required written and skills tests for the positions.
>
> OPERATIONS TECHNICIAN TRAINEE I:  An employee skilled in power plant or industrial process operations.   Shall have successfully completed a two year

---

2   The Court will cite the parties' memoranda addressing each Motion in a similar manner.  Thus, Plaintiff's response to Defendant's Motion #1 will be cited as Pl.'s Resp. #1, Defendant's reply in support of Motion #1 will cited as Def.'s Reply #1, and so forth for Motions #2 and #3.

accredited operator training program or equivalent industry recognized program. Shall have passed the required written and skills tests for the position.

*Id.* Ex. B at 27-28.

In addition to a number of "Essential Duties," the actual Human Resources ("HR") "Job Description" for the Operations Technician I position ("Technician I") listed necessary "Qualifications," including:

High school diploma or equivalent required.

Must satisfactorily complete and pass a written and hands-on skill test for the position.

. . . .

Minimum of three (3) years combined cycle or co-generation experience (including combustion turbines) as a journeyman level Operations Technician or equivalent or a minimum of three (3) years experience as a FEUS Operations Technician-Trainee is required.   Similar experience and/or training may be considered.

*Id.* Ex. E at 2-3.

The HR Job Description for the Position of Operations Technician-Trainee II ("Trainee II") also contained certain "Qualifications," including

High school diploma or equivalent required.

Must have successfully completed an industry recognized 2 year process operator training program and completed two (2) years as an Operations Technician– Trainee I.   Must pass a qualifications test for advancement from Trainee I to Trainee II.

*Id.* Ex. D at 2.   The "Essential Duties" for the Trainee II position included "[e]xpected to complete training for advancement to the position of Operation Technician."   *Id.* Ex. D at 1.

4

The HR Job Description for the Operations Technician-Trainee I position ("Trainee I") did not have any "Qualifications." *Id.* Ex. C. The "Essential Duties" included being "[e]xpected to complete training for advancement to the position of Operations Technician-Trainee II, with eventual promotion to Operation Technician." *Id.*

At the time Ms. Garcia applied for a Trainee I position with the City, she had twenty-eight years of power plant experience in different fossil fuel generation units at Arizona Public Service ("APS"), including over four years performing the duties of an Operations Technician I, a journeyman level position. *Id.* Ex. O; Pl.'s Resp. #3 (ECF No. 62) Ex. 2 at 40:9-41:9, Ex. 16. She also had taught classes related to industrial process operations at San Juan College and had operated natural gas systems for power plant operations. Pl.'s Resp. #3 Ex. 16. In the cover letter to her application, Ms. Garcia stated: "Although I have many years of experience as an operator, I realize that there is a lot to learn in any power plant to become familiar with the equipment and operate in a safe manner, so the Operations Technician Trainee position will be a natural place to start." Def.'s Mem. #3 Ex. O. During her hiring interviews, several managers, including Mike Sims, Generation and System Control Manager, and Richard Miller, Generation Superintendent, assured Plaintiff that she would be given accelerated promotional opportunities because of her extensive background in power generation.[3] Pl.'s Resp. #3 Ex. 1 ¶ 1.

Farmington hired Ms. Garcia as a Trainee I on April 1, 2009. Def.'s Mem. #3 at 7 ¶ 16. She was the first female employee on the operations side of the Generation Division. Pl.'s Resp.

---

3   While Farmington objects to this evidence from Plaintiff's Affidavit on grounds that the statements are hearsay, the Court finds that they are not hearsay; they are admissions by a party-opponent. FED. R. EVID. 801(d)(2)(D); *see also Johnson v. Weld Cnty.*, 594 F.3d 1202, 1208-09 (10th Cir. 2010).

#3 Ex. 2 at 123:11-23.  Although the City asserts that she was assigned the same job duties and given the same training as other trainees, Ms. Garcia complained about disparate job assignments.  Def.'s Mem. #3 at 5 ¶¶ 8, 10, Ex. F ¶¶ 4-5, Ex. J ¶¶ 7,8.  Her complaints included that other employees did not perform menial duties with the same frequency that was required of her, that these tasks were given to her in a punitive manner, and that training was administered in a discriminatory fashion.  Pl.'s Resp. #3 at 2-3 ¶¶ 5-7, Ex. 2 at 45:22-47:19 (Ms. Garcia explains how she was not trained as to a certain scenario, despite the requirements of the CBA), 137:14-16 ("I have my own job to do, but I'm asked to do . . . somebody else's work.  Not to do it for them, but to do it.  To help is one thing but to do it for them is something else.").  A specific complaint was that

> [the j]ob assignments I was given were different from the job assignments other trainees were given. . . . I had to clean the bathrooms on a daily basis, dump trash, sweep the STG building. . . . On the same day the other trainee [Damon Ben] would be given different tasks.  He would sit in the control room, he was allowed to train up there with the operator.

Def.'s Mem. #3 Ex. H 143:11-18.

Both prior to and following Plaintiff's initial complaints, Mr. Miller sent reminders to employees about the manner in which job assignments were to be made.  *Id.* Ex. F ¶ 4; Pl.'s Resp. #3 Exs. 4, 5.  In his e-mail to the Operation Technicians on the subject of "cleaning assignments," dated May 4, 2009, Mr. Miller stated:

> It is your responsibility to clean your areas.  The trainees and relief operators are there to assist you, not do the work for you.  Assiting [sic] means helping you with your areas or watching the control room while you are out doing your duties.  Do not push your responsibilities off on them they have thier [sic] own duties to take care of. . . .

6

Pl.'s Resp. #3 Ex. 5.

At Mr. Miller's request, Mr. Sims met with Ms. Garcia on May 27, 2009, "to clarify to her the requirements of her position as an Operations Technician Trainee I."  Def.'s Mem. #3 Ex. J ¶ 8.  It was Mr. Sims understanding "that Ms. Garcia had been disruptive and insubordinate when asked to perform assignments by the Operations Technician," and he determined that "Ms. Garcia's version of the events differed substantially from those of the Operations Technician involved."  *Id.*  Mr. Sims explained to Plaintiff "that she was to do exactly as the Operations Technician on duty requested and, if she thought she was being taken advantage of, to discuss it with Mr. Miller but by no means was she ever to refuse to perform a task unless a safety issue was involved."  *Id.*

By November 11, 2009, Ms. Garcia had completed all of the training courses associated with the Trainee I position, Pl.'s Resp. #3 at 9 ¶ 4, Ex. 8 at 25:9-14, a year and three months ahead of schedule, Def.'s Mem. #3 Ex. F at 2 ¶ 7.   On March 30, 2010, Mr. Miller evaluated Ms. Garcia for the year 2009/2010. Pl.'s Resp. #3 at 11 ¶ 16, Ex. 8 at 30:10-20.  He marked the section "Interpersonal Relations" as "Needs Improvement" because he "had received many complaints from other employees that she was a hard person to work with."  *Id.* Ex. 8 at 35:1-15. He did not verify any of these complaints, however, and he himself did not find Ms. Garcia to be a hard person to work with.  *Id.* at 35:20-24.

During her first year with the City, Plaintiff experienced ongoing workplace hostility. *Id.* at 9 ¶ 5, Ex. 14 at 1.[4]  She was afraid to report it, however, because she was a probationary employee and had been told by Mr. Simms to keep her mouth shut if she wanted to remain employed. *Id.* Ex. 14 at 1. Mr. Sims also told her that every Ops Tech was her supervisor and she had to do whatever they told her. *Id.*  On June 15, 2010, after becoming a permanent employee, she and Union Steward Dennis Beznoska met with the City's Human Resources Manager, Donna Brooks, to report her claims of discrimination, retaliation, and hostile work environment. *Id.* at 9 ¶ 5, Ex. 14 at 1; Def.'s Mem. #3 at 9-10 ¶ 30.  These involved three topics: her treatment by Operations Technician Bryson Ahkeah, issues with the co-ed restrooms, and inappropriate treatment by a secretary, with the support of the supervisors. Pl.'s Resp. #3 Ex. 14 at 1-4.

Ms. Garcia previously had complained to Mr. Miller about Mr. Ahkeah, that he was threatening and harassing her, telling her multiple times "he would 'run my ass off.'"  *Id.* at 1.

---

4   Plaintiff's Exhibit 14 to her response to Defendant's Motion #3 is a written script she read to Donna Brooks on June 15, 2010.  Pl.'s Resp. #3 Ex. 14 at 1; Def.'s Reply #3 (ECF No. 70) Ex. E 58:17-20. Farmington objects to this exhibit on grounds that it is "based on Ms. Garcia's own write up of her allegations and report to human resources." Def.'s Reply #3 at 6-7 ¶ 4.  The document includes an initial statement that "Juanita Garcia read the following information to Donna Brooks: . . . because the issues are difficult and painful for me, and I don't want to get off course if I become emotional." Pl.'s Resp. #3 Ex. 14 at 1.  Defendant does not deny that Plaintiff read the document during the meeting, nor does it dispute its content.  Indeed, the City includes her "claims of discrimination, retaliation and hostile work environment . . . on June 15, 2010," and the subsequent investigation and remediation in its own "Statement of Undisputed Facts."  Def.'s Mem. #3 at 9-10 ¶¶ 29-32.

Citing to Ms. Garcia's deposition testimony, the City does complain that the HR director requested a copy of Ms. Garcia's document, which Plaintiff failed to provide.  Def.'s Reply #3 at 7, Ex. E 58:17-59:5.  Ms. Garcia further explained at that deposition, however, that when asked for her notes she said she would contact the union representative to see if it was "proper to surrender the notes.  And [he] was to get back with Ms. Brooks and advise me to surrender them to her, if I needed to.  And I was never given that direction."  *Id.* 58:25-59:5.  Neither Donna Brooks nor anyone else later asked Plaintiff for her notes.  *Id.* 59:6-10.

Farmington also seems to argue that evidence is not based upon personal knowledge and doesn't set forth facts that would be admissible in evidence.  Def.'s Reply #3 at 7.  The Court is not convinced.

Although Mr. Miller "said he would take care of it," the treatment continued. *Id.*  Plaintiff's

complaints concerning Mr. Akheah included:

> [He] threatened me several times at work, in front of [male] witnesses . . . and said he would "run my ass off". [sic]  My supervisor addressed it with him; he didn't stop.  Instead he began spreading stories against me and being meaner.  He also continued to say "I'll run your ass off". [sic]
>
> Bryson threw a banana peel at the wall to make a basket in the trash can.  He missed and it and it landed on the floor.  He said "pick it up". [sic]  I said "What's wrong with your hands, you pick it up."  He said "I'm your boss.  I said pick it up, now."  I felt threatened and picked it up because I was on probation.
>
> . . . .
>
> [In front of a male witness,] Bryson took a bottle from the fridge . . . .  He waived it at me and smiled.  I asked what he wanted.  He said "You know, you're Mexican, read the bottle". [sic]  It said El Jarrito.  I told him I'm not Mexican.  He argued and said "Oh yes you are.  You're Mexican.["]  I told him "I'm Spanish and Italian". [sic]  He said "No, you're Mexican.  What's the difference?"
>
> When the newspaper had a story about Arizona lawmakers addressing undocumented immigrants, . . . [a male coworker] said "You better have your green card."  Bryson said "You better not go to AZ, they won't let you come back, they'll send you back with your people."  They were all (3) [men] laughing.
>
> I told Richard Miller that Bryson snaps his fingers at me and says "Hey, get outa that chair.  You don't belong in here."  When I point out that I have a right to be in the control room, Bryson says "No you don't.  I'll find something for you to do", [sic] and he laughs [and] then gives me a job, usually dirty work.  He doesn't mistreat the other trainees like that, just me.  He follows me around and checks on me, and asks why it's taking so long or why I'm not done yet.  He pushes me every chance he gets.
>
> . . . .  [A male coworker and I] came in to relieve Bryson and [a male trainee].  Richard Miller . . . was in the control room.  The trash cans were overflowing . . . .  Bryson told me rudely in front of my supervisor "Get that trash dumped NOW.  Damon didn't have time". [sic]  Damon was just standing there, didn't make a move.  Richard didn't correct Bryson or say anything.
>
> . . . Bryson told people I ratted someone out and got them days off for a clearance violation, which wasn't true.  Bryson spread the word to the operators not to trust me.  He was purposely trying to ruin my reputation with the other operators.  I reported it to management . . . .  My supervisor was there during the finding of the clearance problem and knew I had nothing to do with turning anyone in.  When I reported it, I told Miller I wanted it shut down.  Richard Miller said he was there and knew what happened that day, and he'd address it.

> After it was addressed by my supervisor . . . Bryson's response was "Don't say anything in front of Juanita.  She'll turn you in."
>
> . . . .
>
> On 05/14/10 [in front of outside reps and two male employees], Bryson said "Here's our secretary". [sic]  I said "I'm not your secretary.  I'm an operator." Bryson said "You're our new secretary."
>
> On 05/24/10 [in front of a male employee] Bryson said "She's our little typer."

*Id.* at 1-3.

Ms. Garcia also informed Ms. Brooks about problems with the restrooms:  "The restrooms are co-ed, not a problem.  I'm not asking for special treatment or special conditions, just common courtesy.  The doors do not close properly.  I've written a work order previously and they have not been fixed.  The door locks are inadequate." [5]  *Id.* at 3.  And, finally, she described how she was required, with the concurrence of management, to do secretarial tasks that male trainees were not required to perform.  *Id.* at 3-4.

Following the June 15 meeting with Plaintiff, Ms. Brooks and Ms. Grantham-Richards, the City's Electric Utility Director, conducted an investigation into her complaints, interviewing twenty employees.  Def.'s Mem. #3 at 10 ¶ 30, Ex. X.  On September 13, 2010, they sent a one-page memo to Mr. Sims and Mr. Fitzgerald, IBEW representative, in which they reported that, with one exception,[6] all of the interviewees stated that they had not observed or did not

---

5    Richard Miller submitted a Work Order for the restroom repairs with a due date of July 6, 2010.  According to the Closed Work Order form, the repairs were completed on September 21, 2010.  Pl.'s Resp. Ex. 13.

6    Plaintiff points to several instances in the interview notes where interviewees supported her allegations:

Emeric Blair:    Tension between Bryson and Juanita . . . one way; Bryson treats her like dirt.  2 strikes – race + gender. . . . [H]e is rude to her.  [She w]as going to show [him] something on the computer and [Bryson] told Juanita "go to the bathroom!"  . . . .  If she's going to show me something I don't know about, it really irritates him.  Don't know why. . . . .  Bryson

remember any of the events Plaintiff had described. *Id.* Ex. X. They did conclude, however, that professional workplace diversity training would take place, "[t]o ensure there is a widespread understanding of acceptable work behaviors."[7] *Id.* On September 17, 2010, Ms. Garcia filed a grievance, claiming that her "complaints . . . about discrimination and unfair treatment in job assignments and issues involving treatment [she had] received in the past" had not been properly addressed. Def.'s Mem. #1 (ECF No. 51) at 1 ¶ 1, Ex. B.

Mandatory workplace diversity, sexual harassment, and retaliation training for all power plant personnel, including management, took place in October 2010. *Id.* at 10 ¶ 32, Ex. K 1-2. Following the training, however, Plaintiff continued to make reports of discrimination and harassment about the same issues she had raised in June. Pl.'s Resp. #3 at 9 ¶ 6; Def.'s Reply #3 (ECF No. 70) at 7 ¶ 5. On December 14, 2010, Ms. Garcia filed a Charge of Discrimination with the EEOC. Def.'s Mem. #3 at 10 ¶ 34.

---

will tell him not to pay attention to her – has happened more than once. . . . Bryson is really nice to Damon – let him study – but always bugging Juanita to go do something. . . . . Bryson said that Juanita ratted out on the safety violation. . . . . Can't tell her anything because she'll run and tell somebody. . . . . Does believe there is a difference in the way Bryson talks to Juanita as opposed to Damon.

Pl.'s Ex. 19 at 4.

Willie Taylor:     'F___' part of [Bryson's] vocabulary – to everyone.  Juanita did ask him to watch his language but he doesn't.  . . . .  Bryson does treat Juanita differently than other trainees.  Belittles her, disrespectful. . . . .  [U]sed the b____ word when she was out of the room.

*Id.* at 4, 6.

7   Farmington also claims that Mr. Akheah was disciplined after the investigation, citing to Ms. Grantham-Richards deposition testimony. Def.'s Mem. #3 at 10 ¶ 31. Ms. Grantham-Richards stated, however, "Bryson Ahkeah was disciplined for something, but I can't remember what. I just don't remember." *Id.* Ex. T 69:5-7. Mr. Ahkeah himself, when asked whether he was disciplined as a result of any allegations that Ms. Garcia brought forward, answered, "No, I wasn't." Pl.'s Resp. #3 Ex. 15 29:17-20.

11

Plaintiff applied for a posted Operations Technician I position on December 10, 2010. Def.'s Mem #3 at 7 ¶ 20.  On January 3, 2011, the City notified her that

> [a]lthough those who applied were given serious consideration, we have decided not to fill this position.
>
> Due to some changes, we will be re-opening this position with an amended job description soon.  We encourage you to look over the new job description and feel free to re-apply, if you wish.

Pl.'s Resp. #3 Ex. 20.  Plaintiff subsequently applied for Technician I positions on January 4, March 19 and May 2, 2011, and for several openings on January 16, 2012.  Def.'s Mem. #3 at 7 ¶ 20.  The City did not consider her for the positions because it decided she did not have the requisite qualifications, specifically, prior combined cycle gas turbine experience, and because she had not completed three years as a trainee.  *Id.* at 7-8 ¶ 20

On January 17, 2011, Mr. Miller sent another e-mail to the operators on the subject of "Trainee duty assignments":  "Once again a reminder.  When assigning duties to the Trainees, make absolutely sure you assign the same duties to each of the Trainees.  When you assign duties make absolutely sure you are fair in these assignments.  Keep an accurate log of these assignments."  Pl.'s Resp. #3 Ex. 6.

The next day, an incident occurred between Plaintiff and Audie Click.[8]  *See id.* Ex. 3. She submitted a written "Complaint" to Mr. Miller on January 19, as he had requested that morning, recounting the events.  *Id. passim* & 4.  According to Ms. Garcia:

---

8   The City claims that Ms. Garcia was called "a liar" and "unqualified" in the context of a disciplinary investigation involving determination of whether she "moved the load" while she was in the control room on that

> . . . Audie instructed me to run the units like I'm the operator on shift + he'd sit
> back + watch me.  Audie told me not to move the load unless he was present
> w/me in Control Rm.  I asked when to start another cooling tower fan.  Audie said
> about 99-100˚ play with it, get used to it.

*Id.* at 1.  After she ran several of cooling tower fans, seeing how the temperature reacted, Ms.

Garcia went to the restroom.  *Id.*  When she returned,

> . . . Audie was in the control room.  Audie spun the camera to NE corner of north
> CT + told me to go paint the lid on the City water manhole <u>right now</u>.  I tried to
> tell Audie what was going on with the fans.
> - Audie started raising his voice + yelled "You lied!  You're up here running the
> unit but not running it!  I heard what you told Julie on the Gaitronics.  You lied.!"
> - Why was Audie listening in on my conversation with Julie?  Julie had paged me
> to pick up the calendar for the AAB Room.  I told her I couldn't go now because I
> was waiting for Audie so I was running the unit but not running the unit because I
> couldn't move the load.
> - Audie has no business eavesdropping + calling me a liar.
> - Audie yelled at me + told me I'm not qualified + he's going to Richard to tell
> him not to promote me.  He said I don't deserve it.  Audie said I don't know what
> I'm doing + I messed this unit up.  Audie said "its [sic] beginning trainee stuff,
> how to balance circ [sic] water + you don't know how!"  Audie yelled that I
> couldn't experiment with the temp + accused me of messing up the unit.  He said
> even Damon can do it!
> - I told him just raise #2 STG load a little to even out the temp.  I had to wait for
> you because you told me not to move the load unless you were here.

*Id.* at 1-2.  Plaintiff continued:

> - Why didn't Audie calmly have me move the load while he watched me or move
> it + give me instructions?  Instead, he yelled at me + intimidated me + told me to
> leave the control room <u>Right now</u> + go paint.  He ran me off!
> - I told Audie several times not to talk to me like that + to calm down.  He kept
> yelling for me to get out!

*Id.* at 2.  Ms. Garcia further explained to Mr. Miller that she

---

date.  Def.'s Mem. #3 at 9 ¶ 26.  Ms. Garcia disputes Defendant's version of the facts, asserting that the comments
took place in the context of the regular performance of her job duties.  Pl.'s Resp. #3 at 7 ¶ 16.

was very upset + trying not to cry.  … I was afraid to go back to the control room since he threw me out, so I didn't go back.

. . . .

- I was so upset I almost quit my job!  That's horrible.  I want Audie's behavior to stop!  Audie's opinion shouldn't be relied on – it's skewed.  I've reported this before to you + HR.

- At this point I'm respectfully requesting an appointment with Patrick Hardin @ Human Resources to discuss this hostile work environment.

- I want you to investigate + and put a stop to Audie's behavior + intimidation of me, immediately.

I'm not here to be yelled at.

I'm not here to be screamed at.

I'm not here to be intimidated.

. . . .

. . . Audie's behavior is rude, unprofessional, de-moralizing, threatening, intimidating, + disruptful.  This behavior interferes with my ability to do my work.

Audie knew about the grievance settlement, which was not to be discussed with other members.

- I want to know how I'm to handle the situation with Audie because you still have me working directly with him even after I've informed you previously of problems.

*Id.* at 2-4.

Mr. Hardin, Senior Personnel Analyst, met with Ms. Garcia and Mr. Fitzgerald on January 21, 2011.  Pl.'s Resp. #3 Ex. 12 at 1.  Mr. Hardin conducted an investigation into Plaintiff's hostile work environment claim and issued his report on February 7, 2011.  *Id.*  He determined that the January 18 incident was "a s/he said s/he said situation," but concluded, after requesting a generation history report and consulting two experienced Operation Technicians, that "despite her understanding that she was not authorized to do so, Ms. Garcia manually moved

the load [in the wrong direction]. . . while she was alone in the control room." *Id.* at 1-2.  This, then, created a "credibility issue with [her] claim."[9] *Id.* at 2.

Subsequently, however, on February 15, 2011, Mr. Fitzgerald informed Mr. Hardin by e-mail that

> [t]he operators log on the load change was not as objective as I believed.  I have found out that the load can be controlled from remote locations other than the board.  I have ask [sic] if there would be any record of which location the change was inputted from and have been advised that although the technology exists it was not working during the event.

Pl.'s Ex. 11 at 2.  Mr. Hardin forwarded this message to Mr. Sims, copying Ms. Grantham-Richards.  *Id.* at 1.  Mr. Sims responded the next day that, "This action could have been performed from one of the other work stations."  *Id.*

In March 2011, the City adopted a "validated testing policy" Def.'s Mem. #3 at 8 ¶ 21, which utilized tests "prepared by an outside consultant who specializes in preparing validated tests or . . . tests supplied by an outside entity providing on-site or on-line training as part of an in-house employee training program," *id.* Ex. S at 1. The stated purpose of the new "Hiring and Promotional Testing Process" was "to ensure consistent treatment throughout the Farmington Electric Utility's personnel [sic] when testing is part of the hiring and promotional process . . . [by] remov[ing] a division's ability to screen questions given to applicants but assur[ing] non-

---

9   Mr. Hardin also concluded that Ms. Garcia's allegations regarding alleged public comparison of employee performance information was "unsubstantiated" because on an unannounced site visit on January 21 he "did not see any comparison charts/graphs that stated specific employee names."  Pl.'s Resp. #3 Ex. 12 at 2-3.  He further noted with regard to Plaintiff's concerns about "fair opportunity for promotions, [that] we have not recently gone through any promotional processes to make this claim valid," and that she "is currently ineligible for promotion under the City of Farmington job description."  *Id.* at 3.  Finally, he recommended "that F.E.U.S. management should continue to take the proactive approach to educate and train their employees in team building exercises and proper work place behaviors; such as the mandatory sexual harassment / cultural diversity training held in October 2010."  *Id.*

biased questions." *Id.* Guidelines were instituted for "administering, scoring, and evaluating test

scores," including:

### 1. Training Program Testing

Testing given to employees to determine successful completion of a structured in house training program such as . . . operator trainee program training shall require validated tests . . . . The tests shall be administered to . . . trainee positions at the completion of their second and third year. . . . . Successful completion of this testing process shall normally consist of a written validated test with a 60% weight and an oral or practical interview with a 40% weight. . . . . Under any scenario of training program testing, a score of 70% or greater is required on the written test for successful completion.

Any employee not achieving the required score will be given one opportunity to retest six (6) months from the date of the first test. Not achieving the required score on the second test will terminate the employee's employment with the City of Farmington Electric Utility.

### 2. Promotional Testing

Testing given to employees to determine qualification for promotion shall require validated tests as defined above. . . . . Successful completion of this testing process shall require a minimum composite score of 65% or above. Composite weighting shall consist of a written validated test with a 60% weight and an oral interview/practical with a 40% weight. Under any scenario of promotional testing, a score of 50% or greater is required on the written test for successful completion.

Any employee not achieving the required score will be given one opportunity to retest six (6) months from the date of the first test. Not achieving the required score on the second test will terminate the employee's employment with the City of Farmington Electric Utility.

*Id.* at 1-2 (footnote omitted).

In April 2011, Ms. Garcia had completed two years in the Trainee I position and the City

allowed her to test for the Trainee II position. Def.'s Mem. #3 at 7 ¶ 17. She passed and was

promoted to Trainee II. *Id.* Also that April, on her second year anniversary evaluation for

16

2010/2011, Mr. Miller downgraded Ms. Garcia's "Interpersonal Relations" rating to "Unsatisfactory" because three employees out of twenty-one in the Generation Division, Mr. Taylor, Mr. Click, and Mr. Ahkeah, had told him they could not get along with her.  Pl.'s Resp. #3 at 11 ¶ 16, Ex. 8 at 36:18-20, 40:10-41:10.

On March 28, 2012, with her September 2010 grievance claims scheduled for arbitration, the IBEW, on Plaintiff's behalf, and the City's Electric Utility entered into a Settlement Agreement to resolve her allegations of harassment, discrimination, and failure to train.  Def.'s Mem. #1 at 1 ¶ 1, Ex. A at 1.  Pursuant to the Settlement Agreement, the City was to send memos to all Generation Division employees "clearly communicating . . . expectations concerning harassment, discrimination and retaliation . . . and expectations concerning what is and what is not proper direction for Unit employees to give as far as work assignments to Trainee I and Trainee II [sic]."  *Id.* Ex. A at 1.  In compliance with these requirements, Ms. Grantham-Richards and Mr. Sims sent a memo discussing "Workplace Behavior" to Generation Division employees on March 29, 2012, *id.* at 2 ¶ 2, Ex. C, and on March 30, Mr. Sims sent an e-mail to these employees addressing "Direction of employees," *id.*, Ex. D.  The parties also agreed "to establish a 'clean slate' going forward . . . that all promotion and employment decisions affecting Ms. Garcia will be based upon her conduct and performance from this date forward . . . ."  *Id.* at 2 ¶ 3, Ex. A at 2.

The Settlement Agreement additionally provided that an Operations Technician I position would be held open until Ms. Garcia "takes the test for that position," and that she would be promoted to that position if she passed "that test."  *Id.*

17

Furthermore, with regard to "the test," Ms. Garcia would

> be permitted to delay her test for the Operations Technician I position to a date no more than one month after she has had the opportunity to observe and/or participate in, which ever she chooses, two start-ups of the Animas power plant, presently anticipated to occur in April and May, 2012 unless the Animas power plant is not scheduled for shut-down and start-up in that time frame, in which case Ms. Garcia will be permitted to test at the next available start-up.

*Id.*  If the start-up was "warm," rather than "cold," Ms. Garcia was "expected to walk through and orally explain the 'cold' start-up steps . . . not . . . required due to the 'warm' start-up."  *Id.* If Ms. Garcia

> advise[d] the Electric Utility that she is ready to test, but the Animas power plant is not scheduled for start-up in the time set out above, she will test at the next scheduled start-up . . . .   Her pay and job seniority will be retroactive to the day after she indicates her readiness to test, assuming that she passes the test.

*Id.*

On April 3, 2012, having completed three-years employment, Ms. Garcia took the written exam for the Technician I position.  Def.'s Mem. #3 at 7 ¶ 18, Ex. P.  The City determined that she did not pass the written exam at that time.  *Id.* ¶ 18, Ex. P; Def.'s Mem. #1 at 2 ¶ 6.  Ms. Garcia expressed concerns about portions of the examination and the testing service discovered that eight of the 150 questions in the validated testing materials had incorrect answers or were not included in the training materials, an error rate that it described as "not acceptable."  Pl.'s Resp. #1 (ECF No. 61) at 2 ¶ 4, Ex. 1 at 3, Ex. 2 at 10:17-21, Ex. 3 at 110:23-111:6.  Rather than retesting Ms. Garcia with a corrected test, however, the City adjusted her score by excluding the improper questions.  *Id.* Ex. 2 at 10:22-12:6; Ex. 3 at 110:23-111:9, 111:25-113:6.  This procedure could have prevented Plaintiff from attaining a higher and even a passing grade,

18

assuming she had the opportunity to get correct answers on the omitted questions. *Id.* Ex. 2 at 10:22-13:6; Ex. 3 at 110:23-111:9, 111:25-113:6.

Ms. Garcia filed her lawsuit in this matter on April 13, 2012. She passed the written exam six months later, in October 2012, and subsequently passed the skills assessment/hands-on test and was moved to the Technician I position, retroactive to October 2012. Def.'s Mem. #3 at 7 ¶ 19.

### III.  STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Thus, pursuant to Rule 56, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Id.* at 248. "All facts and reasonable inferences, however, must be construed in the light most favorable to the nonmoving party." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (internal quotations omitted).

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing

19

that there is a genuine issue for trial.  *See id.*; *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281

(D. Kan. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  There is no issue for

trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict

for that party.  *See Anderson*, 477 U.S. at 248.

## IV.  ANALYSIS

### A. Defendant's Motion for Summary Judgment on Plaintiff's Breach of Settlement Agreement Claim

In Count VI of her Amended Complaint, Plaintiff brings a breach of contract claim under

New Mexico law, charging that the City breached the parties' March 28, 2012, Settlement

Agreement.   Am. Compl. 14-15.   She asserts that Defendant is in breach for "failing to

substantially perform in accordance with the language" of the Settlement Agreement, *id.* ¶ 83,

and, alternatively, repudiating it, "by declaring its intent not to be bound by . . . the terms," *id.*

¶ 84.

Pursuant to New Mexico law, a party to a contract may breach it by "failing to perform a

contractual obligation when that performance is called for . . . or announcing ahead of time that

[it] will not perform a contractual obligation when the time for that performance comes due."

NMUJI 13-822.  "The failure of a party to the contract to perform satisfactorily [its] contract

promise or duty . . . constitutes a breach of the contract, giving rise to a remedy, typically

damages." *Id.* Comm. Cmt.

Defendant maintains that it met its obligations regarding the Settlement Agreement and,

therefore, no breach occurred.   These obligations included sending memos to all Generation

Division   employees   "clearly   communicating   . . .   expectations   concerning   harassment,

discrimination and retaliation [and] expectations concerning what is and what is not proper direction for Unit employees to give as far as work assignments to Trainee I and Trainee II. [sic]"   Def.'s Mem. #1 ¶ 2, Ex. A at 1.   The City also agreed to hold open a position of Operations Technician I until Plaintiff took "the test for that position" and to promote her to that position if she "pass[ed] that test," as set forth in the agreement.   *Id.* Ex. A at 1-2.   Lastly, the parties expressed their intent "to establish a 'clean slate' going forward," with "all promotion and employment decisions affecting Ms. Garcia . . . based upon her conduct and performance from [the date of the Settlement Agreement] forward."   Def.'s Mem. #1 ¶ 3, Ex. A at 2.

Clearly, as Defendant contends, and Plaintiff does not dispute, Farmington met its obligations under the Settlement Agreement with regard to sending the memos to its employees: on March 29, 2012, Ms. Grantham Richards and Mr. Sims circulated a memo titled "Workplace Behavior" to Generation Division Employees and on March 30, 2012, Mr. Sims sent an e-mail, titled "Direction of employees."   *Id.* Exs. C, D.   Farmington further claims that "an additional term" in the Settlement Agreement was that Ms. Garcia "would take the *written* examination for the Operations Technician I position," *id.* ¶4 (emphasis added), and that it complied regarding this testing when Ms. Garcia took "the *written* examination for the Operations Technician I position" in April 2012, *id.* ¶ 6 (emphasis added).   Plaintiff responds that

> [n]othing in the Settlement Agreement references the requirement or need for [her] to take a written test to qualify for promotion to the Operations Technician I position.   It was beyond the scope of the Settlement Agreement to compel [her] to make the promotion to Operations Technician I contingent upon the passing of a written test.   The only test described in the Settlement agreement is a hands-on operational test.

Pl.'s Resp. #1 ¶  2.   The Court agrees.

21

The Settlement Agreement specifically refers to "the test for [a position of Operations Technician I], as set out below," and "[i]f Ms. Garcia passes that test as set out below, she will be promoted . . . ." Def.'s Mem. #1 Ex. A at 1. The following paragraph sets forth the timing and preparation for "her test": she would "be permitted to delay her test . . . to a date no more than one month after she has had the opportunity to observe and/or participate in . . . two start-ups of the Animas power plant," and if Animas was "not scheduled for shut-down and start-up" in the anticipated time frame, she "will be permitted to test at the next available start-up." *Id.* Additionally, "[s]hould the start-up be a 'warm' start-up, rather than a 'cold' start-up, Ms. Garcia will be expected to walk through and orally explain the 'cold' start-up steps that may not be required due to the 'warm' start-up." *Id.* Ex. A at 1-2. Nowhere is a "written test" mentioned.

The City articulates new arguments in reply: that City is bound by the CBA, which states that "all persons hired for employment in the . . . Generation Division of the electric utilities system shall be required to meet the same skills and qualifications for a given job description as do members of the Union," and that the CBA provision regarding testing includes "written tests." Def.'s Reply #1 (#ECF No. 68) at 1 ¶ 1. Defendant further offers the conclusory statement that "Ms. Garcia has known all along that a written exam and a hands on skill assessment is required for the operator positions." *Id.* It also purports to cite Ms. Garcia's deposition testimony for the proposition that this was "the same process that was used when she was initially hired, when she was moved from the trainee I to the trainee II position and what she expected when she tested for the Operations Technician I positions." *Id.* at 1-2 ¶ 1, Ex. A 68:6-16. Defendant additionally directs the Court to support supposedly found in a transcript, apparently prepared by Ms. Garcia,

memorializing her conversation with Mr. Miller and Mr. Sims in February 2012, during which the contents of the written test were discussed. *Id.* at 2 ¶ 1, Ex. C. The Court is not convinced by any of these arguments.

First, the Settlement Agreement makes no reference to the CBA and appears to be a complete agreement within its four corners. If and how the CBA might trump the Settlement Agreement is beyond the scope of Defendant's Motion. In any case, the portion of the CBA the City quotes, "all persons hired for employment," does not seem relevant to Ms. Garcia's status when she and Farmington entered into the Settlement Agreement; she was not applying to be hired, in fact she had been employed by Defendant for almost three years. Also, Ms. Garcia's deposition testimony only partially supports the proposition for which Defendant cites it, that she took a test when initially hired. There is no mention in that testimony about anything having to do with what happened when she moved from a Trainee I to a Trainee II position or what she expected when she tested for the Technician I position. *Id.* Ex. A 65-68 (discussing Plaintiff's application for a Trainee I position, that she applied for that position because there was no Operations Technician posting at the time, that she interviewed for the Trainee I position and took and passed a "a technical test" and "a physical strength test"). Furthermore, the discussion and transcript upon which Defendant relies predates the Settlement Agreement by a month and a half, making its relevance to the alleged breach of the Settlement Agreement unclear, at best.

Given that Defendant has not met its burden of showing that no genuine issue of material fact exists as to whether it breached the Settlement Agreement with regard to testing Plaintiff for the Technician I position, the Court will deny its Motion for Summary Judgment. The Court

23

finds it unnecessary at this juncture to address Plaintiff's additional arguments, such as whether she actually failed the written test she took, whether that test was valid, and what written test, if any, might have been appropriate.   The Court similarly need not consider now whether Farmington complied with the provision "to establish a 'clean slate' going forward."

**B.  Defendant's Motion for Summary Judgment on Plaintiff's Claim of Prima Facie Tort**

Farmington moves for summary judgment on Plaintiff's prima facie tort claim on grounds that it is based upon the same facts as her other causes of action.  Def.'s Mem. #2 (ECF No. 53) at 3. Plaintiff did not respond to Defendant's Motion.

The Local Rules for the District of New Mexico provide that "failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion."  D.N.M.LR-Civ. 7.1(b).  The Tenth Circuit Court of Appeals has stated, however, that

> [e]ven if the opposing party does not respond to the summary judgment motion, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law.  If it has not, summary judgment is not appropriate."  Because a failure to respond means the facts are considered undisputed, "[t]he court should accept as true all material facts asserted and properly supported in the summary judgment motion.  But only if those facts entitle the moving party to judgment as a matter of law should the court grant summary judgment."

*Wilson v. Vill. of Los Lunas*, 572 F. App'x 635, 640 (2014) (citations omitted) (quoting *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir.2002)).   Thus, the Court will address the merits of Defendant's Motion.

24

New Mexico adopted prima facie tort as a cause of action in *Schmitz v. Smentows*ki, 109 N.M. 386, 785 P.2d 726 (1990).  The theory behind prima facie tort is "that a party that intends to cause injury to another should be liable for that injury, if the conduct is generally culpable and not justifiable under the circumstances."  *Id.* at 394, 785 P.2d at 734.  Thus, prima facie tort "offers a remedy for plaintiffs who have been harmed by a defendant's intentional and malicious acts that fall outside of the rigid traditional intentional tort categories."  *Id.*  Therefore, if a plaintiff establishes facts supporting a traditional tort, the case must be decided on that cause of action, not under prima facie tort.  *Id.* at 396, 785 P.2d at 736.

Having reviewed the Motion, the Court agrees with Defendant that the undisputed material facts show that Plaintiff's purported prima facie tort claim is based upon the same facts that support the other causes of action in her Amended Complaint.  Therefore, the prima facie tort claim cannot stand and the Court will grant the Motion for Summary Judgment on Plaintiff's Claim of Prima Facie Tort.

## C. Defendant's Motion for Summary Judgment on Plaintiff's Title VII Gender Discrimination and Retaliation Claims

Farmington moves for summary judgment on Ms. Garcia's claims of Title VII gender discrimination for failure to promote and hostile work environment and her retaliation claim. The City's position basically is that it "did not treat Plaintiff any differently than any other trainee, and that is why she is disgruntled."  Def.'s Mem. #3 at 10.

### 1. Title VII Failure to Promote Claim

"Title VII of the Civil Rights Act of 1964 prohibits . . . unlawful employment discrimination on the basis of an individual's sex."  *Tabor v. Hilti, Inc.* 703 F.3d 1206, 1216

(10th Cir. 2013) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000) (citing 42 U.S.C. § 2000e–2). If a plaintiff puts forth direct evidence of discrimination, she will not be "subjected to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* (parallel citations omitted). When the evidence of discrimination is circumstantial, however, as both parties argue here, the *McDonnell Douglas* test assigns to the plaintiff the initial burden of establishing a prima facie case of discrimination. *See id.* at 1216. "The burden at this stage is 'not onerous,'" *id.* (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (internal quotation omitted)), indeed, it is "slight," *id.* at 1216 n.4 (quoting *Orr*, 417 F.3d at 1149)).

To establish a prima facie case of discrimination under *McDonnell Douglas*, "a plaintiff must demonstrate by a preponderance of the evidence that (1) she belongs to a protected class; (2) she applied for an available position for which she was qualified; (3) she 'was rejected under circumstances which give rise to an inference of unlawful discrimination.'"[10] *Id.* (quoting *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the plaintiff states a prima facie case, "the burden shifts to the employer to proffer 'a legitimate non-discriminatory purpose for the adverse employment action.'" *Id.* at 1216-17 (quoting *Orr*, 417 F.3d at 1149). If the employer meets its burden, "the plaintiff will avoid summary judgment only if she shows her sex 'was a determinative factor in the . . . employment decision, or show[s] the [employer's]

---

10   Defendant sets forth a four-part test originating from *McDonnell Douglas*, which the Tenth Circuit no longer prefers. *Tabor*, 703 F.3d at 1216 n.4. Rather, the Tenth Circuit "expressly prefers" the more recent variation, a three-part test articulated by the Supreme Court in *Burdine*. *Id.* (citing *Sorbo v. United Parcel*, 432 F.3d 1169, 1173 (10th Cir. 2005)).

explanation for its action was merely pretext.'"  *Id.* at 1217 (quoting *Horizon/CMS Healthcare*,

220 F.3d at 1191 (alterations in original)).

While Defendant does not dispute that Plaintiff belongs to a protected class and sought

the Technician I position,[11]  it does contest whether she was qualified for that position.  The City

argues that the position required combined cycle or co-generation experience[12] or, alternatively,

three-years experience as a FEUS Operations Technician Trainee, and that Ms. Garcia did not

meet either of these requirements before April 2012.  Def.'s Mem. #3 at 12.  For these reasons,

according to Defendant, Ms. Garcia was not considered for any of the open positions.[13]  *Id.* at 7

¶ 20.

Defendant points to the "Qualifications" listed in the HR Job Description for Operations

Technician I, *id.* Ex. E., in support of its argument.  The relevant provision provides:  "Minimum

of three (3) years combined cycle or co-generation experience (including combustion turbines) as

a journeyman level Operations Technician or equivalent or a minimum of three (3) years

experience as a FEUS Operations Technician – Trainee is required."  *Id.* at 3.  Farmington,

---

11  Between December 10, 2010 and January 16, 2012, Ms. Garcia submitted applications for at least six posted Operations Technician I positions.  Def.'s Mem. #3 at 7 ¶ 20.

12  In its Statement of Undisputed Facts, Defendant asserts that "[s]pecifically, Ms. Garcia did not have prior combine cycle *gas turbine* experience."  *Id.* at 8 ¶ 20 (emphasis added).  That "*gas turbine* experience" specifically was required, however, is nowhere supported in the record.  Although Mr. Sims stated at his deposition that he amended the Technician I job description to require "a certain amount of experience in a combined cycle power plant with *gas turbine* experience" after halting hiring for the December 2010 opening in January 2011, Pl.'s Resp. #3 Ex. 17 110:14-111:4 (emphasis added), the Job Description itself, which was last reviewed in November 2011, does not contain the term "gas turbine," Def.'s Mem. #3 Ex. E.

13  In its reply, Farmington declares that Ms. Garcia, "even as late as April 2012, had not passed the written test."  Def.'s Reply #3 at 9.  This argument is disingenuous, at best, as the City itself admits that it declined to consider her applications for any of the open Technician I positions prior to April 2012.  Def.'s Mem. #3 at 12 ("Ms. Garcia . . . was not given the opportunity test [sic] for the Operations Technician I position prior to April 2010.").

however, fails to include the last sentence of this provision: "*Similar experience and/or training may be considered.*" *Id.* (emphasis added).

Plaintiff, at a minimum, establishes a genuine issue of fact as to whether she met the qualification requirements for Operations Technician I. First, she offers evidence that she had decades of experience working at a coal-powered plant, including more than four years as an Operations Technician and three years as a journeyman, thereby, at least arguably, meeting the stated requirements even before being hired by the City. Pl.'s Resp. #3 Ex. 1 ¶¶ 3, 5; Ex. 2 at 38:4, 41:8-9; Ex. 16 at 1. Additionally, she had operated natural gas systems for power plant operations, *id.* Ex. 16 at 1, and testified that the equipment used in coal-fired and gas-fired plants is very similar, with the turbines at each functioning the same in regard to the combustion process, and the concepts related to power generation being the same, *id.* Ex. 2 at 42:14, 43:11-14, 44:21-22, 48:22-23.

Additionally, the City's electric utility management itself initially recognized Plaintiff's "similar experience": Mr. Sims and Mr. Miller both told her during her hiring interviews that she "would be given accelerated promotional opportunities because of [her] extensive background in power generation." *Id.* Ex. 1 ¶ 2. Defendant offers no evidence that it informed Ms. Garcia that she was unqualified with regard to her applications between December 2010 and June 2011; to the contrary, when the City decided not to fill the first opening she applied for in January 2011, Ms. Garcia was encouraged "to look over the new job description and feel free to re-apply if you

28

wish."  *Id.* Ex. 20.   And, as Plaintiff contends, Farmington arguably applied the "similar experience" criteria in hiring a male applicant, Bryan Johnson.[14]  Pl.'s Resp. #3 at 2 ¶ 4, 4 ¶ 11.

Finally, the City contends that it had a legitimate and non-discriminatory reason for not "prematurely promoting" Plaintiff – the requirements set forth in the Collective Bargaining Agreement.  According to Defendant, the provision that "all persons hired for employment in the . . . Generation Division of the electric utilities system shall be required to meet the same skills and qualifications for a given job description as do members of the Union," would not allow the sort of exception Ms. Garcia requested.  Def.'s Mem. #3 at 13, Ex. B. at 5.  Farmington again argues that Ms. Garcia did not meet the experience requirements stated in the job description for the Operations Technician I position: "three years of experience with combined cycle or co-generation, or three years of experience in the Operations Technician training position with the City."  Def.'s Mem. #3 at 14.

Plaintiff, however, offers ample evidence of pretext for gender discrimination, pointing first to the hiring of Brian Johnson, who, arguably, was less qualified than she and for whom the City appears to have applied the "[s]imilar experience and/or training" provision of the job description, as opposed to how it treated Plaintiff.  Ms. Garcia also contends that, in any case,

---

14  Mr. Johnson had not worked in power generation; his experience as an Operations Technician I was at a gas processing facility and involved extracting liquid out of gasified natural gas.  Def.'s Mem. #3 Ex. M 5:11-7:13.  The City argues that part of Mr. Johnson's work "involved electrical generation, and the same type of equipment and processes used in the City power plants making him eminently qualified to be a City Operations Technician I."  *Id.* at 6 ¶ 14.  As Plaintiff notes, however, Mr. Johnson did not state that he used "the same type of equipment and processes," rather he testified only that the process was "[s]imilar in that you're dealing with pressures and temperature."  Pl.'s Resp. #3 at 4 ¶ 11; Def.'s Mem. #3 Ex. M at 6:22-7:1.  Additionally, Mr. Johnson did not testify that his work "involved electrical generation"; he said he was "dealing with electrical generation."  Def.'s Mem. #3 Ex. M 7:9.

she met the minimum qualifications listed in the job description, and notes that by the time she first applied for the position in December 2010, she had completed all of the training courses associated with the Trainee I position.  Pl.'s Resp. #3 at 9 ¶ 4.

Furthermore, as discussed with regard to the Settlement Agreement, there are issues of fact as to whether Ms. Garcia should have been required to take the written test.  Even if that was appropriate, Plaintiff also calls into question which testing criteria should have applied to her and whether she, in fact, failed the test.  If she had been considered for promotional testing, which required a minimum written test score of only 50%,[15] she would have passed, as she scored at least 60%.  Pl.'s Resp. #3 at 6-7 ¶ 15, Ex. 2 160:7-11, Ex. 9 12:7-12; Def.'s Mem. #3 Ex. S. Finally, there also are questions regarding the validity of Defendant's Validated Testing procedure, as applied to Ms. Garcia.  It is uncontested that eight of the 150 questions on the test she was required to take had incorrect answers or had not been included in the training materials and, therefore, were excluded from her score.  This procedure, as opposed to retesting with 150 valid questions, could have prevented her from attaining a passing grade.[16]  *Id.*

Clearly, genuine disputes of material fact exist as to whether Ms. Garcia was qualified for the Operations Technician I position, whether she was rejected under circumstances which give rise to an inference of gender discrimination, and whether the City's proffered legitimate non-

---

15   Testing for outside applicants, like Mr. Johnson, also required a minimum score of only 50%.  Def.'s Mem. #3 Ex. S at 2.

16   Neither party has provided Ms. Garica's exact score, but she testified that it was in the high 60's, perhaps 68%.  Pl.'s Resp. #3 Ex. 2 160:7-9.  Assuming a score of 68%, Ms. Garcia may have had 97 correct answers out of the 142 scored questions on the test.  If eight additional valid questions had been provided and she had gotten them all correct, her score would have been 70%, a passing grade even for the training program testing.

discriminatory purpose for failing to promote her was pretextual.  Therefore, Defendant's Motion for Summary Judgment must be denied as to Plaintiff's Title VII failure to promote claim.

## 2. Hostile Work Environment Claim

While Title VII does not create a "general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S 75, 81 (1998), it does prohibit severe or pervasive sexual harassment," *id.* at 78.  For a plaintiff to prevail on a gender-based hostile work environment claim, she must show that she was discriminated against because of her gender and "that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment."  *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012) (internal quotation marks omitted).  This showing includes both objective and subjective components – "whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended."  *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (internal quotation marks omitted).  Looking at the "totality of the circumstances," the Court considers "such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Morris*, 666 F.3d at 664 (internal quotation marks omitted).  This is not "a mathematically precise test," and the severity and pervasiveness evaluation "is particularly unsuited for summary judgment because it is quintessentially a question of fact."  *Hernandez*, 684 F.3d 957-58 (internal citations and quotation marks omitted).

Farmington first argues that "[s]everal of Plaintiff's hostile environment claims, like the comments by Mr. Akheah, are appropriately characterized as 'stray remarks,' that are insufficient to establish a hostile work environment."  Def.'s Mem. #3 at 15.  It then asserts that the "stray remarks of which Plaintiff complains were neither pervasive nor severe,"[17] giving three examples:  1) "[b]eing greeted with 'good morning you m-f-ers,'" although admittedly offensive, happened once when Ms. Garcia was present, and stopped after she complained; 2) being "told she kept asking the same stupid question," which happened once; and 3) being "yelled at when she was told to leave the control room," another "isolated incident that cannot create a viable claim for hostile work environment."  Id. at 17-18.  Farmington additionally contends that "Plaintiff has not presented any evidence that the alleged acts of hostility or abuse interfered with her work or altered the conditions of her work environment."  Id. at 19.  Finally, the City maintains that it responded in a reasonable manner by investigating Plaintiff's complaints and conducting diversity, sexual harassment, and retaliation training for all power plant employees, including management, and that Ms. Garcia's subsequent complaints "are simply repeat [sic] her previous complaints that she [wa]s not being promoted, trained, or that she [wa]s given unfair discipline."  Id.

Ms. Garcia responds that the City "minimizes the frequency and substance of the facts underlying [her] claims, omits material record evidence going to these claims, and fails to engage

---

17   The Court is perplexed as to the grammatical, factual, and logical basis for Defendant's contention that "[i]f we compare the record evidence to Plaintiff's litany alleged hostile actions, we reveal that of Plaintiff claims are not separate acts but rather the same often repeated sparse events and stray remarks."  Def.'s Reply #3 at 10.  The Court is also unconvinced by Defendant's claim that Plaintiff's "post training complaints were about the same incidents she reported in June 2010 not new claims."  Id. at 11.

in the sort of totality of the circumstances review required under the case law." Pl.'s Resp. #3 at 16. The Court agrees.

In the first place, Defendant mentions only three comments or incidents, and discusses them individually. This approach belies the appropriate analysis of a hostile work environment claim, regardless of whether they may have been stray remarks or isolated incidents, in and of themselves: The Court must address the totality of the circumstances, of which these three examples are, in fact, only a small part.

Ms. Garcia, the City's first and, apparently, only female employee in operations until April 2012,[18] has offered evidence that she experienced and complained of on-going disparate and discriminatory job assignments, harassment, and workplace hostility, beginning only weeks after her hire and continuing for years. She has alleged facts from which a jury could find that she was discriminated against because of her gender and that the work environment was both subjectively and objectively abusive. Furthermore, whether the City's response to her complaints was reasonable is a matter for the jury to determine, given evidence that the hostile work environment did not change after the mandatory training or in response to the numerous memos and e-mails sent to employees over the years instructing them on proper workplace behavior and job assignments for trainees, in addition to the evidence that no employee ever was disciplined with regard to her complaints. For these reasons, Defendant's Motion for Summary Judgment must be denied as to Ms. Garcia's hostile work environment claim.

---

18   The City hired a Hispanic woman as an Operations Technician I in April 2012. Def.'s Mem #3 at 6 ¶ 13, Ex. L.

### 3. Retaliation Claims

Title VII prohibits retaliation against an employee who voices opposition to, or participates in an investigation or proceeding alleging, an unlawful employment practice by the employer. *See* 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected opposition to discrimination, (2) she suffered an adverse action that a reasonable employee would have found material, and, (3) a causal nexus exists between her opposition and the employer's adverse action. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007). If a plaintiff succeeds in proving a prima facie case, the employer must provide a legitimate and facially non-discriminatory reason for its decision. *McDonnell Douglas*, 411 U.S. at 802. If the employer satisfies this burden, the plaintiff must then establish that the defendant's reasons were a pretext for discrimination. *Id.* at 804. Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of belief and thus infer that the employer did not act for the asserted non-discriminatory reasons. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

In *Burlington Northern & Santa Fe Railway Co. v. White*, the United States Supreme Court held that to establish an "adverse action" in the context of a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 68 (2006) (internal

34

quotations omitted).  The intent of this standard is to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."  *Id.* at 70.  The Supreme Court also recently clarified the causation standard for Title VII retaliation claims:  "[A] plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  *Davis v. Unified School Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ____, 133 S.Ct. 2517, 2534 (2013)).

In moving for summary judgment on Plaintiff's retaliation claims, Farmington first argues that the Court previously dismissed any claims based on events that occurred after December 14, 2010, the date Ms. Garcia filed her EEOC Charge.  *See* Mem. Op. and Order.  The Court agrees.  Upon consideration of Defendant's Memorandum Motion to Dismiss Plaintiff's Sex Discrimination and Retaliation Claims (ECF No. 12), the Court ruled that "only those . . . actions which occurred between the time [Ms. Garcia] engaged in her protected activity and filed her EEOC Charge . . . are within the scope of the Charge" and, therefore, are properly exhausted. *Id.* at 10.  The Court also noted that prior to filing the EEOC Charge, Ms. Garcia engaged in two protected activities: complaining to the City Human Resources Department on June 15, 2010, and filing the grievance through the Union on September 17, 2010.  *Id.* at 9.  The exhausted allegations of retaliation encompassed within this period, as pled in her Complaint, were "failing to promote[;] giving her different assignments and testing opportunities from those given to her male co-workers; and subjecting her to harassment."  *Id.* at 10.  No retaliatory acts subsequent to

35

the December 2010 Charge were administratively exhausted, thus depriving the Court jurisdiction over them.  Id.

Inexplicably, Plaintiff ignores this prior ruling by the Court.  She argues that the filing of her EEOC Charge on December 14, 2010, and her hostile work environment claims submitted on January 21, 2011,[19] are cognizable protected activities.  Pl.'s Resp. #3 at 20-21.  Clearly, this is not the case, as they do not meet the exhaustion requirements.  She also points to her "claims of discrimination and harassment given to various management personnel, including the June 15, 2010, claims" as constituting protected activity.  Id.  The Court agrees as to June the 15, 2010, claim, but will limit the protected activity to that event, given that Plaintiff does not provided dates or any specific information regarding other claims to management.

In any event, the adverse employment actions advanced by Ms. Garcia cannot stand.  Plaintiff's failure to promote claims, which refer to her applications for the Operations Technician I positions, all occurred after the cutoff date of December 14, 2010, and therefore, are not actionable.  Plaintiff also maintains that the creation of a hostile work environment in this case "is sufficiently severe to have altered the terms and conditions of [her] employment," thereby constituting an adverse employment action.  Id. at 21.  The Tenth Circuit has recognized that "co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute adverse employment action for purposes of a retaliation claim."  Stover v. Martinez, 382 F.3d 1064, 1075 (10th Cir. 2004) (quoting Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264 (10th

---

19   The actual date Plaintiff made this complaint was January 19, 2011, in regard to the incident with Mr. Click on January 18th.  Regardless, this protected activity falls outside the previously established exhaustion parameters.

Cir.1998)).  Ms. Garcia, however, does not describe any specific conduct, hostile, harassing, or

otherwise, occurring between June 15 and December 14, 2010.[20]  *See Medina v. Income Support*

*Div., N.M.*, 413 F.3d 1131, 1136-37 (10th Cir. 2005) (plaintiff stating only that continuing

hostility constitutes adverse employment action and that work environment was hostile, cold, and

harassing, without alleging specific instances of coworker harassment or describing them in any

detail, does not demonstrate that hostility toward her by coworkers constitutes an adverse

employment action).  As Ms. Garcia has not shown an adverse employment action, she has not

met her burden of establishing a prima facie case of retaliation.  Thus, the Court will grant

Defendant's Motion as to the retaliation claims.


WHEREFORE,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment on

Plaintiff's Breach of Settlement Agreement Claim (ECF No. 50), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on

Plaintiff's Claim of Prima Facie Tort (ECF No. 52) is **GRANTED**.

**IT IS FURTHER ORDERED** that **Defendant's Motion for Summary Judgment on**

**Plaintiff's Title VII Gender Discrimination and Retaliation Claims** (ECF No. 54) is

**GRANTED IN PART AND DENIED IN PART**:

1) The Motion is denied as to Plaintiff's Title VII failure to promote claim.

---

20  Plaintiff's specific complaints regarding Mr. Akheah all occurred prior to her meeting with Ms. Grantham-Richards on June 15, 2010, and thus cannot be viewed as retaliation for that protected activity.  Additionally, the incident involving Mr. Click occurred on January 18, 2011, outside the established retaliatory period.

2) The Motion is denied as to Plaintiff's hostile work environment claim.

3) The Motion is granted as to Plaintiff's retaliation claims.

**SENIOR UNITED STATES DISTRICT JUDGE**