# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

JUANITA GARCIA,

      Plaintiff,

v.                                        No. Civ. 12-383 JCH/SCY

THE CITY OF FARMINGTON,

      Defendant.

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court held a five-day bench trial on February 22-26, 2016. After trial, the parties submitted proposed findings of fact and conclusions of law. The Court, having considered the evidence presented at trial, the demeanor and credibility of the witnesses, the arguments of counsel, the parties' submissions, and the relevant law, makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## **Findings of Fact**

### Structure and Operations of the City of Farmington's Power Plant Generation Division, the Collective Bargaining Agreement, and Relevant Job Descriptions

The City of Farmington (the "City") operates two power plants within the Farmington Electric Utility System ("FEUS"): the Animas Power Plant and Bluffview. Trial Tr. 180:14-182:19. The FEUS power plants are combined cycle plants, in which a gas turbine cycle is combined with a steam turbine cycle. *Id.* 230:19-231:19. In a combined cycle plant, gas is burned to produce electricity through spinning turbines, and the waste heat is used to, essentially, boil water, spin additional turbines, and produce additional electricity. *See id.*

FEUS employees were represented by Local Union No. 611 of the International

Brotherhood of Electrical Workers (the "Union"). *See* Ex. B; Trial Tr. 7:8-20. The City and the Union had a Collective Bargaining Agreement ("CBA") for the period July 1, 2008, to June 30, 2012. Ex. B; Trial Tr. 18:4-21.

Prior to 2007, FEUS operated the Animas Power Plant with a three-person operations crew, but after installing newer technology and automated systems, FEUS began transitioning to a one-person crew between 2007 and 2009. *See* Trial Tr. 182:13-184:3. The change in operations affected the CBA and resulted in re-naming positions and changing job duties, classifications, and qualifications, because an Operations Technician I and II had to be able to operate the plant by himself or herself. *See id.* 184:4-186:24. The one-person operational change also resulted in a change to the training program and testing policy. *See id.* 188:9-191:1, 193:5-196:16. The City switched to an online training program operated by a third party. *Id.* 188:9-189:14.

Under the CBA, the City reserved to itself, among other things, the following functions or rights: to "determine the qualifications for and select and hire new employees"; to "determine the qualifications for and select employees for promotion and transfer"; and to "prepare and make available job specifications and establish job classifications." Ex. B at 5. The CBA also set forth certain classification descriptions that "contain less than minimal requirements and these de minimus requirements are not subject to change outside the Agreement." *Id.* at 27. The CBA stated: "The complete job descriptions are located in the City's Human Resources Department." *Id.* As relevant here, the CBA contained the following de minimus requirements:

> OPERATIONS TECHNICIAN I: Shall be a qualified Journeyman operator designated as such for the rotating shift and is skilled in the operation of steam turbine generating equipment and switchboard equipment. Shall have satisfactorily passed the required written and skills tests for the position.
>
> …

> OPERATIONS TECHNICIAN TRAINEE II: An employee skilled in Power Plant industrial process operations. Shall have successfully completed a two year accredited operator training program or equivalent industry recognized program. Shall have two years experience as an Operator Technician Trainee I and shall have passed the required written and skills tests for the positions.
>
> OPERATIONS TECHNICIAN TRAINEE I: An employee skilled in power plant or industrial process operations. Shall have successfully completed a two year accredited training program or equivalent industry recognized program. Shall have passed the written and skills tests for the position.

*Id.* at 27-28. The CBA additionally states that testing "can consist of a written job knowledge test." *Id.* at 20. The CBA further provides that the "value accorded to the written test, hands-on skills test and oral interview will be established by Management prior to the testing actually taking place and will remain consistent within job classifications." *Id.* The CBA also states that the City Management personnel has the right and responsibility to determine the fitness and ability of employees for promotion, and that they shall consider, among other things, "[e]xperience related to the job." *Id.* at 19. The Court finds the CBA's provisions are consistent in requiring written tests for the positions Ms. Garcia held.

The CBA incorporated the Job Descriptions maintained by the City's Human Resources ("HR") Department, and the Job Descriptions were binding on the City and FEUS employees. *See* Trial Tr. 54:24-57:2, 191:20-192:23, 727:8-728:3. The City thus had to follow the job descriptions and could not make an exception for permanent promotions. *See id.* 54:24-57:2.

The Job Description for the Operations Technician-Trainee I ("Trainee I") position contains the following "Essential Duties":

> Works under the supervision of the Generation Superintendent and is directed by the Operations Technician.
> …
>
> Expected to complete training for advancement to the position of Operations Technician-Trainee II, with eventual promotion to Operation Technician.

3

When necessary, may be assigned to temporarily perform a variety of unskilled or semi-skilled maintenance work….

Ex. I at 000080. To be qualified for the Trainee I position, the employee "[m]ust have successfully completed an industry recognized 2 year process operator training program. Previous power plant experience preferred." *Id.* at 000081. Qualifications also included the "[a]bility to learn operation and maintenance of plant equipment" and the "[a]bility to pass job related training." *Id.* at 000082. The failure or inability of Trainee I employees to complete the training may result in termination. *Id.* at 000083.

During their two-years of training, Trainee I employees took online courses to learn fundamentals. *See* Trial Tr. 188:9-190:19. The online courses had milestone tests, and trainees could take the online tests as many times as they wanted to make a passing grade and to achieve the score they wanted to have on their record. *See* Trial Tr. 188:9-190:19. Trainee I employees also received hands-on training from the operator or relief operator on shift. *See id.* At the end of the two years, a Trainee I had to pass a written test to move into the Operations Technician-Trainee II ("Trainee II") position. *See id.*

The Job Description for the Trainee II position, in place beginning September 2008, included similar duties as for a Trainee I position. *Compare* Ex. J, *with* Ex. I. To be qualified for the Trainee II position, the employee "[m]ust have successfully completed an industry recognized 2 year process operator training program and completed two (2) years as an Operations Technician-Trainee I. Must pass a qualifications test for advancement from Trainee I to Trainee II." Ex. J at 000519. "Qualifications" for the Trainee II position included the ability to "learn operation and maintenance of plant equipment" and "to pass job related training," *id.* at 000520, and the failure or inability to complete that training could result in termination," *id.* at 000521. Trainee II employees had more intense online computer training and more hands-on

4

operational training, including start-ups and shut-downs. *See* Trial Tr. 190:7-19. After completing a year as a Trainee II, he or she had to pass a written test for promotion to Operations Technician I ("Technician I"). *See id.* 190:7-191:14.

On September 25, 2008, the City distributed an operator training policy memorandum stating that Trainee Is had two years to complete the requirements for advancement to a Trainee II position, and Trainee IIs had one year to complete the requirements for advancement to a Technician I position. *See* Ex. 22; Trial Tr. 439:8-440:1. The computerized training, however, was only one portion of the training program, which also consisted of an experience requirement (two years as a Trainee I and one year as Trainee II), formal written testing, and hands on testing. *See* Trial Tr. 190:7-191:1, 323:1-6, 441:11-22, 448:24-25, 970:6-15.

As of July 2009, the Job Description for the Technician I position included the following Qualifications: passing a "written and hands-on skill test"; and "Minimum of three (3) years experience as an Operation Technician – Trainee experience is required. Similar experience may be considered at management discretion." Def.'s Ex. K at 000097-98.

In March 2011, the City changed the Trainee I training program to use an online computer-based, validated program operated by a third party, GPiLearn. *See* Trial Tr. 188:9-189:7, 200:2-202:25, 326:10-16, 549:3-9. The change in policy had nothing to do with Ms. Garcia and was gender-neutral. *See id.* 961:20-963:4. For "Training Program Testing" – tests administered to trainees at the completion of their second and third year -- trainees had to pass with a 70% composite score or better. *See* Trial Tr. 23:15-25:2, 188:9-189:7; Ex. 65. Employees not achieving the required score would be given one opportunity to re-test six months from the date of the first test. Ex. 65. The City also used validated tests for "Promotional Testing." Ex. 65. For successful completion of promotional testing, the City required "a minimum composite score

5

of 65% or above," with a weight of 60% given to a written validated test and 40% given to an oral interview/practical test. *Id.* "Under any scenario of promotional testing, a score of 50% or greater is required on the written test for successful completion." *Id.* The City had the right under the CBA to weight the tests and the union never grieved the testing policy. Trial Tr. 63:9-65:25. The City applied Promotional Testing to employees in competition with other employees for a higher position, not for the structured training program. *See* Ex. 160; Ex. XXX; Trial Tr. 204:17-205:14. The City applied Training Program Testing for trainees "at the completion of their second and third year." Ex. XXX.

Effective November 2011, the City changed the Technician I Job Description regarding minimal work experience to:

> Minimum of three (3) years combined cycle or co-generation experience (including combustion turbines) as a journeyman level Operations Technician or equivalent or a minimum of three (3) years experience as a FEUS Operations Technician – Trainee is required. Similar experience and/or training may be considered.
>
>        ***
>
> This position requires knowledge to operate at least one of the utility's combined cycle plants as a one man crew with no assistance.

Ex. K at 000512. The City changed the description to better reflect that the requisite "three (3) years experience" it expected was combined cycle experience. *See* Trial Tr. 368:9-369:16; 550:16-551:10. Through experience, the City determined that it was important for an Operations Technician to have combined cycle or co-generation gas turbine experience, because of the added challenge in controlling pressure that is required to operate the City's plants. *See id.* 232:15-236:8. The City previously had fired a male employee with only coal plant operating experience, because he was unable to operate the combined cycle plant. *See id.*

<u>Hiring of Ms. Garcia</u>

The City hired Plaintiff Juanita Garcia as a Trainee I on April 1, 2009. Trial Tr. 603:5-13; Ex. 3. Ms. Garcia was the first female operator in the history of the FEUS's Generation Division. *See* Trial Tr. 96:11-16. She was hired over other male applicants because she scored higher on the entry test. *See id.* 205:15-206:9; Ex. P. She was the first operator trainee who entered the new program with the new classifications. *See* Trial Tr. 335:19-22. She was a probationary employee for the first year of her employment and received quarterly evaluations. *See* Def.'s Ex. V-Y. She was also a Union member and steward. Trial Tr. 724:7-13.

Ms. Garcia had previously worked at Arizona Public Service ("APS"), a coal-fired plant, for about 29 years. *Id.* 603:14-604:1. The APS coal-burning plant differs from a combustion turbine plant because it does not have a gas or combustion turbine associated with the process. *Id.* 231:20-232:8. The City considered her APS experience to have met the Trainee I qualification of having gone through a two-year industry recognized training program. *See id.* 187:3-21; 341:21-343:8. Ms. Garcia, however, had no experience with combined cycle power plants and no experience with gas turbines prior to working for the City. *Id.* 728:22-729:6.

At the time she was hired, the City's chain-of-command was as follows: City Manager Rob Mayes, Utility Director Maude Grantham-Richards, Generation Manager Mike Sims, Generation Superintendent Richard Miller, Operations Technician IIs, Operations Technician Is, Trainee IIs, and finally Trainee Is. *See id.* 229:16-230:17. Donna Brooks was the HR director, and Patrick Hardin also worked in HR. *Id.* 267:17-268:3, 404:3-5.

During her interview for the Trainee I position, Mr. Sims did not promise Ms. Garcia advanced promotion to either the Trainee II or Technician I positions in a timeframe shorter than the two and three years, respective, requirements set forth in the CBA and City policy. See Trial Tr. 246:17-247:11, 341:14-342:1.

<u>Ms. Garcia's Work Environment and Promotion Efforts</u>

The daily job duties of Trainee Is, Trainee IIs, and Technician Is included cleaning up the plant, emptying trash, cleaning bathrooms, and cleaning up spills. *See* Ex. 23; Trial Tr. 222:13-223:4, 554:25-557:19, 845:14-846:1, 852:19-857:9. Trainees could also be assigned non-routine cleaning and maintenance, such as painting, cleaning up spills, and cleaning waste from birds. Trial Tr. 222:13-224:18. Trainee I job duties included following orders given by Operations Technicians. Ex. I. At the time Ms. Garcia began working at the plant, Bryson Ahkeah, Audie Click, Wade Lang, and Steve Bolin worked as Operations Technicians. Trial Tr. 222:3-12.

Ms. Garcia frequently worked under the supervision of Mr. Ahkeah and Mr. Click. *See id.* 647:16-20, 650:15-658:23, 691:3-17. Ms. Garcia in her first year worked with Mr. Ahkeah a lot. *Id.* 647:16-20. She worked for him a little bit less after the first year, but still continued to work with him because he did a lot of vacation coverage as a relief operator. *Id.* 647:21-24.

In her first months of employment, Mr. Miller and all the operators assigned her mostly cleaning duties – bathrooms, trash clean up, and some painting. *See id.* 610:20-611:21. When she told Mr. Miller she was being overloaded with cleaning assignments and asked about his expectations, Mr. Miller told her she was to do what the operators told her to do, but that he did not want her cleaning up for others. *See id.* 611:24-614:9. As a result of these conversations, on April 23, 2009, Mr. Miller issued a memorandum to all plant operators regarding the clean-up assignments of respective operators. *Id.* 611:22-612:17.

Around this time, the plant was in need of housekeeping, so various areas were assigned to different people to clean each day. *See id.* 612:18-613:24. Operations Technician employees, however, were assigning Ms. Garcia work that they or others had been assigned. *See id.* at 614:21-616:6. While she did their work, they generally would stay in the control room. *See id.*

8

When Ms. Garcia complained to Mr. Miller, he sent an email on May 4, 2009, to all Operation Technician IIs telling them that it is their responsibility to clean their own areas and trainees were there to assist, not do the work for them. *See id.*; Ex. 25.

On May 26, 2009, Mr. Click told Ms. Garcia to clean bird excrement from the windows. Trial Tr. 616:9-15. Mr. Click complained to Mr. Miller that Ms. Garcia refused to clean-up the poop and that she generally refused to clean up when operators assigned her duties. *See id.* 616:9-618:15; Ex. 26. Mr. Miller called her into his office and asked if she had been insubordinate, but she denied the accusations. *See* Trial Tr. 616:9-618:15. He told her she could not refuse any order because she was on probation and could be terminated for any cause. *Id.* 461:11-462:23; 616:9-618:21.

The next day, Mr. Click told her to clean the turbine deck and falsely reported to Mr. Miller that she had been insubordinate again. *See id.* 619:22-620:23. Mr. Miller once more called Ms. Garcia into his office, and then they went to speak with Mike Sims. *See id.* 621:12-24. Mr. Sims told Ms. Garcia that everyone is her boss, and she had better keep her mouth shut and do what she was told. *Id.* 621:14-622:24. Following the meeting, Mr. Sims emailed Ms. Grantham-Richards, notifying her that Ms. Garcia had two incidents of insubordination and recommending she be terminated if it occurred again. Ex. 27.

Afterwards, operators continued to assign Ms. Garcia a disparate amount of cleaning assignments that were within their own work areas and part of their duties. *See* Trial Tr. 92:24-98:1, 122:12-17. In her first five months of training, she spent half to two-thirds of her time cleaning. *See id.* 740:9-22. Ms. Garcia tried to keep a low profile and did what she was told without complaining during the rest of her probationary period. *Id.* 622:25-623:14. From 2009 through 2012, she did not refuse to do work she was directed to do. *Id.* 620:24-621:8.

Mr. Ahkeah treated Ms. Garcia differently from other trainees by belittling her and disrespecting her. *See id.* 116:18-118:14, 655:12-658:23, 894:8-895:16; Ex. 158. On several occasions, Mr. Ahkeah told her that he planned to "run [her] ass off." Trial Tr. 650:15-651:1. At some point, Mr. Ahkeah greeted a number of employees in a room, including Ms. Garcia, with, "Good morning, mother fuckers." *See id.* 100:8-21, 861:6-24.

Damon Ben began working for the City as a trainee in September 2009 and was similarly situated to Ms. Garcia. *See id.* 97:18-20, 743:10-22. Ms. Garcia worked together with Mr. Ben on day shifts for the first year, and when they went to rotation, she continued on occasion to work with him. *Id.* 642:11-19, 743:10-22. The operators, including Mr. Ahkeah, did not treat Mr. Ben in the same manner: they assigned him fewer and easier clean-up tasks; he rarely cleaned the bathrooms; they allowed him to stay on the computer; they would order Ms. Garcia to do what he was supposed to be doing; and they often ordered her off the computer to do something else, so that Mr. Ben was given more training opportunities than she was. *See id.* 97:18-98:1, 99:10-100:1, 118:9-14. Additionally, Mr. Ahkeah and other operators would cordially invite Mr. Ben along for hands-on training, but would not invite Ms. Garcia as often. *See id.* 642:2-644:25. When Ms. Garcia asked for training, Mr. Ahkeah frequently told her it was not his job to teach her or to spoon feed her. *Id.* Mr. Ahkeah made comments to her that she was "too slow," "Can't you read faster," and "You're taking too long." *Id.* 627:22-628:3.

In preparation for Ms. Garcia's second quarterly evaluation, Mr. Miller authored a document in September 2009 in reference to a number of reports by anonymous co-workers claiming that Ms. Garcia made disparaging remarks against co-workers, without identifying what the remarks were or who made them. Trial Tr. 467:14-471:5; Ex. HH. At the end of the document, Mr. Miller wrote that he felt Ms. Garcia was failing to complete her probationary

period in an acceptable manner, and he sent the document to Mr. Sims. Ex. HH; Trial Tr. 467:14-471:5. At some point during her probationary period, Mr. Miller expressed to Mr. Sims that he did not want Ms. Garcia to continue as an employee. Trial Tr. 480:10-481:10.

On September 23, 2009, Mr. Miller told Ms. Garcia during her second quarterly evaluation that she was showing improvement with issues raised in the previous quarter, but expressed concern for anonymous reports by co-workers that she was making degrading and disparaging remarks about her co-workers' abilities to perform their jobs. *See* Ex. 1; Ex. HH; Trial Tr. 627:1-11. Ms. Garcia then informed Mr. Miller, among other things, that Mr. Ahkeah was riding her hard and intimidating her. Ex. 1; Trial Tr. 627:1-19. She also complained that the Operations Technicians were not training her appropriately. Ex. 1; Trial Tr. 629:3-20. In his written second quarterly evaluation, Mr. Miller recommended continuation of the probationary period and said she was acquiring skills at an acceptable rate, but he included his memorandum concerning his September 23, 2009 conversation with Ms. Garcia about disparaging comments she made. Ex. 1; Ex. 12; Trial Tr. 471:6-472:25.

On September 24, 2009, Mr. Miller met with Mr. Ahkeah to discuss Ms. Garcia's report about his treatment of her. Ex. WWWWW. Mr. Miller told Mr. Ahkeah that threatening remarks were unacceptable and instructed him not to make any remarks like that anymore. *Id.* Mr. Miller placed his note regarding the meeting with Mr. Ahkeah in his own file, but it did not go into Mr. Ahkeah's personnel file. *See* Trial Tr. 597:2-598:20. After this meeting, Mr. Ahkeah became more hostile toward her, continuing to make degrading comments to her, cutting her down, and showing her little respect, but he was never disciplined. *See id.* 394:1-4, 627:17-631:6.

On November 11, 2009, Ms. Garcia, by studying before and after work, had completed all of the computer-generated courses for Trainee Is. *Id.* 632:1-633:13. Following the training,

and quarterly thereafter, Ms. Garcia began asking the City to consider her past APS work experience to put her on a faster track for promotion to a Trainee II position. *Id.* 447:21-448:3, 633:19-634:15. The City, however, told her she could not be promoted into the Trainee II position until April 2011, when she had completed her two years of hands-on training in the Trainee I position, as required by the CBA. *See* Trial Tr. 448:4-25, 635:6-8; Ex. B; Ex. 6. The City did not regard her APS employment to be sufficiently similar to experience as an operator at a combined cycle plant. *See* Trial Tr. 20:10-19, 531:7-532:2.

Mr. Miller's third quarterly evaluation on January 5, 2010, recommended continuation of her probationary period and noted no identifiable areas of concern or deficiency. Ex. 12. Her May 1, 2010 fourth quarterly evaluation said she had shown considerable improvement and recommended a status change to non-probationary. Ex. 12. On her March 30, 2010 annual evaluation, Mr. Miller gave her all satisfactory scores except for "needs improvement" in adaptability and interpersonal relations. Ex. 137; Trial Tr. 479:9-16. For the interpersonal relations score, he marked "needs improvement," even though after September 2009 he received no further complaints from co-workers about disparaging remarks. *See* Trial Tr. 483:11-484:5.

Around April 2010, Mr. Ahkeah ate a banana, threw it towards the trash, missed, and ordered Ms. Garcia to pick it up. *Id.* 653:25-654:24. She responded, "You pick it up. It's your banana." *Id.* He responded that he was her boss and ordered her to pick it up, which she did. *Id.*

Between April and July 2010, Mr. Ahkeah continued to say he was going to run her ass off. *Id.* 654:25-655:4. He would snap his fingers at her and tell her to get out of the chair because she did not belong in the control room. *See id.* 655:5-25. Ms. Garcia reported the finger-snapping incident to Mr. Miller in May 2010. *Id.* At least once a week Mr. Ahkeah belittled her and told her to get out of the control room. *See id.* 655:18-656:12. He would then laugh and order her to

do dirty work, while allowing Mr. Ben to stay in the control room. *See id.* 655:18-656:20. Mr. Ahkeah called Ms. Garcia "stupid," "slow," and "dumb" regularly. *See id.* 741:2-742:25. On May 14, 2010, after she was given a special project requiring office skills, Mr. Ahkeah referred to her as a "secretary" in a demeaning fashion. *See id.* 657:24-658:15. He also disparagingly told her on May 24, 2010, that she was "our little typer." *Id.* 658:16-23.

Ms. Garcia made ongoing complaints to Mr. Miller that Mr. Ben was getting training and she was getting disproportionate cleaning duties. *Id.* 494:1-497:11. Mr. Miller did not attempt to verify her complaints. *See id.* Instead, he believed that she just did not want to clean – that cleaning was beneath her – despite the fact that she completed cleaning duties assigned her. *See id.* She also made several requests of Mr. Miller, approximately six times, asking him to change her work schedule so she would not have to work with Mr. Ahkeah or Mr. Click, but he denied each request. *See id.* 691:3-17.

On June 15, 2010, when Ms. Garcia's probationary period ended, she reported to HR Director Donna Brooks that she was being threatened and harassed by Mr. Ahkeah. *See* Ex. 101; Trial Tr. 650:5-14. Ms. Garcia reported the incidents involving Mr. Ahkeah threatening to run her ass off; saying, "Good Morning, you mother f—ers"; throwing the banana peel; intimidating and belittling her, and making her do his cleaning duties instead of training her. *See* Ex. 101.

In late July 2010, when Audie Click and Ms. Garcia were in a vehicle together, he complained to her about the strength of her perfume and notified Mr. Miller of the incident. *See id.* 528:8-529:12, 898:10-899:15, Ex. II; Ex. JJ.

Ms. Brooks and Ms. Maude Grantham-Richards conducted an investigation into Ms. Garcia's June 15, 2010 allegations, interviewing about 20 City employees. *See* Ex. 158; Trial Tr. 107:17-108:12, 964:18-972:24. Ms. Grantham-Richards made notes of the interviews, which

accurately reflect the conversations that occurred. *See id.* 994:14-995:12.

Although a number of the employees did not report disparate treatment, *see* Ex. 158, Mr. Blair reported that Mr. Ahkeah treated Ms. Garcia badly, describing his treatment of her, "like dirt," *id.*; Trial Tr. 107:17-110:12, 122:20-25. He reported that when Ms. Garcia was going to show Mr. Blair something on the computer, Mr. Ahkeah told Ms. Garcia to "go to the bathroom," and on another occasion, Mr. Ahkeah told Mr. Blair not to help her with the valves. *See* Ex. 158; Trial Tr. 123:4-18. He explained that Mr. Ahkeah would get irritated when Ms. Garcia showed Mr. Blair something he did not know and that Mr. Ahkeah told him not to pay attention to her. Ex. 158; Trial Tr. 123:15-18. He reported that Mr. Ahkeah treated Mr. Ben nicely, letting him study, but was always bugging Ms. Garcia to go do something. *See* Ex. 158; Trial Tr. 107:17-110:12, 124:4-7. Mr. Blair informed them that he believed there was a difference in the way Mr. Ahkeah talked to Ms. Garcia as opposed to Mr. Ben. *See* Ex. 158; Trial Tr. 124:4-7. He said that her gender was a strike against her, because other employees treated her differently. *See* Ex. 158; Trial Tr. 122:23-124:7.

Mr. Willie Taylor also reported to Ms. Brooks and Ms. Grantham-Richards that Mr. Ahkeah treated Ms. Garcia differently than other trainees, belittling her and disrespecting her. *See* Ex. 158; Trial Tr. 994:14-195:12, 1006:9-17. He informed them that Mr. Ahkeah used the "b----" word when she was out of the room. Ex. 158; Trial Tr. 1008:20-1009:10. He also told them that Ms. Garcia worked with Mr. Click and Mr. Ahkeah the most. Ex. 158.

Freddie Jaramillo and Tom Jones, in their interviews, reported an incident in which Tom Jones radioed for Audie Click, and when Juanita Garcia answered that he was not there, Mr. Jones said he needed to talk to somebody important. *See* Ex. 158; Trial Tr. 1011:13-1013:11. When she confronted Tom Jones afterwards, he raised his hand as if to say not to talk to him. *See*

Ex. 158; Trial Tr. 1011:13-1013:11. Mr. Jaramillo stated that at first he thought "it was because she was a woman," although he said he had no reason to think she was mistreated. Ex. 158.

In Mr. Ahkeah's interview, he said he had no recollection of the "run her ass off" comment, or the banana peel incident, or saying "Good morning, you mother fuckers." *See* Ex. 158; Trial Tr. 994:14-195:12. Many employees, however, reported that Mr. Ahkeah had said, "Good morning, you mother fuckers." *See* Ex. 158; Trial Tr. 1002:14-1003:24. Mr. Ahkeah admitted at trial that he was not truthful in his interview with HR. *See* Trial Tr. 397:13-16.

On September 13, 2010, Ms. Brooks and Ms. Grantham Richards finalized their report on their investigation. Ex. 141. The report's conclusion was as follows:

> In general, most of the responses and comments received during the twenty interviews we conducted were the same with one exception. The activities as described by Ms. Garcia either were not observed, or the employees did not remember when the specific incidences as they were brought up by Ms. Brooks.
>
> What was supported by all the Operations Technicians was that they all had to perform the same duties as are being requested of Ms. Garcia when they were going through the training program. They also supported the idea of cleaning up the language at the power plants….
>
> To ensure there is a widespread understanding of acceptable work behaviors, the Human Resources Department … will engage the services of a professional to provide workplace diversity training.

*Id.*

Despite that Ms. Garcia complained of differential treatment in work assignments and the investigation uncovered that several employees confirmed that Ms. Garcia was being treated differently in the workplace and mistreated with respect to work duties and that Mr. Ahkeah, who she worked with a lot, belittled her, *see* Ex. 158, the City ignored the corroborative evidence and never mentioned the evidence in the report, *see* Ex. 141; Trial Tr. 150:15-151:24. Nor did Ms. Brooks or Ms. Grantham Richards conduct any follow-up investigation based on the

corroborating reports. *See* Trial Tr. 996:3-1011:9. They did not investigate what kind of hands-on training Ms. Garcia was receiving. *Id.* 1024:9-12. The investigative report made no reference to the use of "Mother f---er" in the workplace, even though Ms. Brooks knew this allegation had been confirmed. *See* Ex. 141; Trial Tr. 145:5-22.[1] Nothing in the investigative report addressed Ms. Garcia's issue that her job was being threatened by male employees. Trial Tr. 149:20-150:1; Ex. 141. The investigative report did not address Ms. Garcia's hostile work environment claims. Trial Tr. 151:25-152:19; Ex. 141.

The City never disciplined Mr. Ahkeah, nor any other employee, for any issue related to Ms. Garcia. Trial Tr. *See* Trial Tr. 394:1-4, 1027:16-20. No one from the City ever addressed with Mr. Ahkeah Ms. Garcia's complaints that he isolated her in the workplace, gave her the worst job assignments, called her "slow and stupid," or treated Mr. Ben better than she. *Id.* 399:14-401:3. During the investigation and up to the diversity training, Mr. Ahkeah and Mr. Click continued to supervise her. *Id.* 527:23-528:7.

On September 17, 2010, after complaining to Mr. Miller concerning her disparate treatment, Ms. Garcia filed a grievance, referencing her complaints verbally raised to Ms. Brooks on June 15, 2010. *See* Ex. 75-76. Ms. Garcia asserted a number of violations of the CBA, and she asked the City to cease the disparate treatment and ensure that EEOC and Title VII requirements were met. Ex. 76.

On October 12, 2010, Ms. Garcia finished her Trainee II courses. Trial Tr. 636:15-25. By November 30, 2010, Ms. Garcia completed written test quizzes required before eligibility for promotion. *See id.* 639:1-23. The City, however, informed her she was not eligible to be

---

[1] The Court finds that Mr. Ahkeah used the inappropriate greeting; however, the Court does not find that the phrase was a gender-based comment or that Mr. Ahkeah directed the comment specifically to Ms. Garcia in a manner intended to contribute to the hostile work environment against Ms. Garcia. Instead, the Court finds that it is relevant to Mr. Ahkeah's credibility during the City's investigation.

promoted until she reached her three-year mark with the City in April 2012. *See id.* 361:24-365:13, 639:1-23, 831:16-24. The City based its reasons on the language of the CBA and its reasonable, non-discriminatory belief that Ms. Garcia's experience with APS's coal-fired plant was not sufficiently similar experience for her to be sufficiently skilled to operate the combined cycle plant. *See* Trial Tr. 230:21-236:6, 361:24-365:13, 831:16-24.

On October 18, 2010, as a result of HR's September 13, 2010 investigative report, the City required its FEUS employees to attend diversity training. *See* Trial Tr. 141:23-142:13; Ex. XXXXX. At the training, Mr. Click expressed his displeasure at having to attend, blamed Ms. Garcia, and said, "We've got to do something about this." Trial Tr. 671:20-672:14; Ex. XXXXX.

A day after the diversity training, Mr. Ben complained about Ms. Garcia having pinched his butt when he asked if he had a wasp on his back on October 14, 2010. *See* Trial Tr. 534:12-536:16; Ex. NN; Ex. 78. Mr. Miller investigated the incident. *See* Ex. NN, OO, PP. Ms. Garcia denied that the incident occurred. *See* Trial Tr. 350:9-352:16; Ex. OO. Despite finding that the report could not be verified, Mr. Miller attempted to put a formal Documented Counseling in Ms. Garcia's employment file to be potentially used for future disciplinary action against her. *See* Ex. 78; Trial Tr. 349:17-352:6, 566:17-567:4, 597:4-598:2. After Ms. Garcia filed a grievance, the City removed the signed Documented Counseling from her record, but an unsigned copy of the Documented Counseling remained in her file. *See* Trial Tr. 352:12-353:17.

On November 4, 2010, Mr. Miller learned that Mr. Click had made comments at the training about Ms. Garcia. *See* Ex. XXXXX; Trial Tr. 671:20-672:14. Mr. Miller told Mr. Click that employees overheard his comments, Mr. Click admitted to the comments, and Mr. Miller told him not to make any more comments of this nature. *See* Ex. XXXXX. The memorandum documenting the meeting was not placed in Mr. Click's personnel file. Trial Tr. 598:21-600:4.

The hostile, pervasive conduct directed at Ms. Garcia did not stop as a result of the training. Trial Tr. 664:7-665:3. Instead, Mr. Ahkeah ratcheted up his demeaning treatment of her. *See id.* 651:2-9.

On December 10, 2010, Ms. Garcia applied for an open Operations Technician I position. *See* Trial Tr. 778:14-779:12; Ex. 21.

On December 14, 2010, Ms. Garcia filed an EEOC Charge of Discrimination based on sex, age, and national origin, and asserting retaliation. Ex. 109. She alleged, among other things, discrimination based on gender for failing to promote her. *See id.* On the Charge, Ms. Garcia noted the "date(s) of discrimination" as April 1, 2009 to October 20, 2010, and marked "continuing action." *Id.*

On January 3, 2011, the City informed Ms. Garcia that she did not get the Technician I promotion. *See* Trial Tr. 830:1-24; Ex. 36. Thus, at the time that Ms. Garcia filed her EEOC Charge, she had not been turned down for a promotion to a position to which she had applied. *See* Ex. 36; Ex. 109.

During the time the City was reviewing applications for open Operations Technician I positions from 2010 to 2012, the City's primary qualification was three years combined cycle, co-generation, or equivalent experience. Trial Tr. 939:21-948:15. Ms. Garcia applied for all four open positions between December 2010 and spring 2012, but did not receive an interview because she did not meet the three years of combined cycle or co-generation experience. *See id.* The City did not consider her APS experience equivalent because of the significant differences between a coal-fired plant and a gas turbine combined cycle plant. *See id.* 450:17-451:11.

On January 17, 2011, Mr. Miller sent an email to operators reminding them to make sure assignments were done fairly. Ex. 38.

On January 18, 2011, Mr. Click told Ms. Garcia to stay in the control room and move the cooling fans, but not to "move the load," meaning to increase or decrease the amount of electrical generation that the plant put out on the grid. *See* Trial Tr. 278:24-279:4; 683:17-684:12. Mr. Click later became angry at Ms. Garcia when he overheard through the plant's loudspeaker system her telling a co-worker that she was running the unit, but not really running it, because she could not move the load, and he accused her of moving the load. *See id.* 683:17-688:24. He aggressively yelled at Ms. Garcia, called her a "liar," told her she was never going to be an operator and he would make sure she would not be promoted, and ordered her out of the control room to go paint in the cold. *See id.* Ms. Garcia was on the verge of tears. *See id.*

After the incident, both Mr. Click and Ms. Garcia submitted letters to Mr. Miller disputing each other's accounts and lodging complaints against each other. *See id.* 274:13-278:16, 683:15-25; Ex. 196; Ex. TT. In an email dated January 18, 2011, Mr. Click complained that Ms. Garcia had not shown an ability to operate the plant capably, asked basic questions over and over again, and incited divisiveness. Ex. TT. He added the demeaning comment, "She does do a good job cleaning the bathroom." *Id.* In her letter dated January 19, 2011, Ms. Garcia presented a complaint of harassment and hostile work environment to Mr. Miller, claiming that Mr. Click had mistreated her in the workplace and requesting an appointment with Patrick Hardin. *See* Trial Tr. 683:15-25, Ex. 196. Mr. Miller put her complaint in his file, but did not turn it over to the HR department. *See* Trial Tr. 507:1-510:8.

On January 20, 2011, Mr. Click referred to Ms. Garcia as "sassy," said she asked stupid questions, that she was stupid, that he was tired of her and did not need her around. *Id.* 691:22-692:25. Ms. Garcia began crying and reported the incident to Mr. Miller, saying Mr. Click was aggressive and intimidating her. *Id.* 514:18-25, 520:2-16, 693:1-24. She became sick and asked

to go home, which Mr. Miller allowed. *See id.*

The next day Ms. Garcia met with Mr. Hardin and reported her incident with Mr. Click, asking to be removed from working with him. *See id.* 694:7-25. She said that Mr. Click was not training her and made false allegations against her. *Id.* 695:13-21. Mr. Hardin told her to report to Bluffview. *Id.* 694:22-695:7. Mr. Miller then called the next day and told her they were putting her on a different shift. *Id.* 695:10-12.

The City placed Ms. Garcia on Mr. Blair's shift. *Id.* 104:5-16. Mr. Miller asked Mr. Blair to send him a daily email about what Ms. Garcia did every day. *See id.* 104:5-105:6. He had never made a similar request of Mr. Blair for any other employee. *Id.* Based on his observations, Mr. Blair thought Ms. Garcia was a good worker, she was qualified to be a Technician I, and she performed well on start-ups. *See id.* 93:13-94:6, 102:10-24.

Emmanuel John, a Technician I as of September 2009, never saw Ms. Garcia perform her work unsafely or act inappropriately. Trial Tr. 868:15-870:20. She also performed her assigned tasks without complaints. *See id.* 854:19-855:2, 888:6-13.

Mr. Blair saw that other operators frequently asked Ms. Garcia to clean up their areas, which he believed was an abuse of their power. *See id.* 92:24-96:10. He observed that Ms. Garcia did others' clean-up assignments disproportionately for about two years. *See id.* 97:6-98:1, 122:12-17. Mr. Miller at one point told Mr. Blair not to hang around Ms. Garcia. *Id.* 101:4-22. He never told Mr. Blair not to hang around any other operator. *See id.*

Mr. Hardin conducted an investigation of Ms. Garcia's hostile work environment claim concerning the January 18, 2011 incident. *See* Ex. 143; Trial Tr. 405:19-406:15. Mr. Hardin knew that Ms. Garcia had made an EEOC complaint. Trial Tr. 408:14-18. Mr. Hardin did not interview Mr. Click. *Id.* 409:12-23. He did, however, rely on a generation history report and

determined that the load had been manually moved in the wrong direction at the time that Ms. Garcia said she was alone in the control room. *See* Ex. 143; Ex. XX; Trial Tr. 278:17-281:21. In his February 7, 2011 report, Mr. Hardin concluded that Ms. Garcia was not credible when she said she did not move the load and he could not substantiate her hostile work environment complaints. *See* Ex. 143.

On February 15, 2011, Shannon Fitzgerald, Ms. Garcia's union representative, informed Mr. Hardin that the load could be moved remotely from a number of locations in the plant, so the generation history report was not as objective as originally thought. *See* Ex. 83; Trial Tr. 6:19-8:24. Mr. Hardin responded that Ms. Garcia was now turning this into a sabotage allegation, Ex. 83, but he never investigated whether there had been sabotage, Trial Tr. 418:2-419:6. Nevertheless, based on the concerns raised by Mr. Fitzgerald, Mr. Hardin sent out a questionnaire on March 2, 2011, to employees capable of moving the load and asked if they had during the relevant time period. *See* Ex. BBB. After receiving responses from seven employees all denying having moved the load, Mr. Hardin prepared an addendum on March 11, 2011, in which he concluded that his original findings should stand. *Id.* Despite knowing that the load could be moved remotely from locations that Mr. Click had been that day, and that the generation report may not be definitive, Mr. Hardin maintained his conclusion that Ms. Garcia was not credible regarding the load issue. *See* Trial Tr. 299:2-302:6, 413:17-416:15. His credibility conclusion affected his determination that her hostile work environment claim could not be substantiated. *See id.* 299:18-300:6, 415:17-418:1, Ex. 143. Ms. Garcia, however, was not disciplined for the January 18, 2011 incident because the City ultimately acquiesced in the union's position that, given that the load could be moved remotely, the City could not prove that Ms. Garcia had moved the load. Trial Tr. 282:9-283:5.

On March 18, 2011, Ms. Garcia was working with Mr. Blair, but at the end of her shift, Mr. Click and Mr. Ahkeah arrived to relieve him and said she was going to have to do the startup, even though she had not yet performed any startup prior to this event. *Id.* 644:17-645:14. While she conducted the start-up, Mr. Click and Mr. Ahkeah did not provide support, and instead laughed at her. *See id.* 645:18-646:10. Problems arose during the start-up. *Id.* Mr. Miller, in a March 19, 2011 Memorandum, documented the problems and concluded that Ms. Garcia needed more training and practice to operate the plant at a higher level by herself. Ex. GGG.

On April 1, 2011, on her two-year anniversary date with the City, the City promoted Ms. Garcia to Operations Technician Trainee II after she passed her written test with retroactive pay. *See* Ex. Q, S, & T; Trial Tr. 779:13-19. On her April 2011 evaluation for the period April 2, 2010, to April 1, 2011, Mr. Miller gave her a passing grade but noted that she "Needs Improvement" for operation of equipment and adaptability and was "Unsatisfactory" for "Interpersonal Relations." Ex. 146; Trial Tr. 537:6-543:1. The "Needs Improvement" rating was based on the "moving the load" incident. *See* Trial Tr. 537:6-543:1. The "unsatisfactory" rating was based on not getting along with three employees – Mr. Click, Mr. Ahkeah, and Mr. Taylor – among 21. *See id.*

Sometime between April 2012 and November 2012, Karen Reyes, who worked as a Technician I for the City, observed that other male employees commonly treated Ms. Garcia with a lot of hostility. *Id.* 157:21-25, 161:1-24, 165:1-167:25. Ms. Reyes noticed that Mr. Miller was visibly angry with Ms. Garcia, shaking with anger when speaking to her, and he would cut her off and yell at her. *Id.* 161:1-164:1. Ms. Reyes witnessed Steven Bolin, an Operations Technician II, assign Ms. Garcia to clean bathrooms or paint and laugh about the assignments he gave her. *Id.* 165:1-24.

During her employment, it was difficult emotionally for Ms. Garcia to return to work each day, and she was depressed and stressed much of the time. *See* Trial Tr. 718:21-721:7. The stress took a toll on her health, making her feel physically ill. *See id.* She felt isolated. *See id.* She lost her joy for life. *See id.* She began to argue with her husband and it negatively affected her family atmosphere. *See id.*

Settlement Agreement

The parties entered into a Settlement Agreement ("Agreement") on March 28, 2012, to "resolve the grievance of Juanita Garcia set out in Step 1 grievance dated September 17, 2010 involving allegations of harassment, discrimination and failure to train." Ex. 136. Mr. Fitzgerald, Ms. Garcia, and the City Manager, among others, signed the Agreement. *Id.*

The Settlement Agreement included a "clean slate" provision:

> The parties intend to establish a "clean slate" going forward. The parties intend that all promotions and employment decisions affecting Ms. Garcia will be based upon her conduct and performance from this date forward, although no pre-existing documentation regarding Ms. Garcia's employment will be removed or altered. Similarly, Ms. Garcia shall not be entitled to claim that any possible future promotion and/or employment decisions are the results of claimed discrimination and/or harassment pre-dating this agreement. No presently pending grievances (other than this one) are hereby resolved.
>
> This agreement is a compromise settlement of disputed claims and nothing in this grievance settlement constitutes an admission of any facts or claims by either party.

*Id.* at 2.

Prior to the Agreement, Ms. Garcia, through the Union, had filed a separate grievance concerning the handling of her time sheets. *See* Trial Tr. 595:16-597:1, 715:11-13. The Agreement did not resolve that pending grievance. *See id.* 79:2-21; 88:3-16; 355:2-356:3; 712:12-713:9; 715:2-13; Ex. 136. The Agreement did not mention any specific federal or State

anti-discrimination statutes. *See* Ex. 136. The Agreement also did not contain an express waiver of a judicial forum for Ms. Garcia's Title VII gender-based failure to promote and hostile work environment claims. *Id.*

The CBA did not give the union authority to enforce Title VII anti-discrimination claims. *See* Trial Tr. 14:1-6. Indeed, Mr. Fitzgerald had never settled any Title VII claim through the grievance process. *Id.* 78:3-79:1. Neither Ms. Garcia nor her counsel ever gave the union any such authority to settle her Title VII claims. *See id.* 79:2-9. Neither Ms. Garcia nor the Union intended for the Agreement to resolve her Title VII claims or other grievances. *See* Trial Tr. 78:24-79:21; 88:3-16; 712:12-713:9.

After March 28, 2012, the City based promotion and employment decisions affecting Ms. Garcia only on her conduct and performance following the entry of the Agreement. *See* Trial Tr. 252:7-21, 257:11-14, 271:15-20, 290:20-291:5, 572:4-22, 956:16-957:19.

The Agreement additionally required the City to issue two memoranda to FEUS employees regarding "expectations concerning harassment, discrimination and retaliation," and "proper direction for Unit employees to give as far as work assignments to Trainee I and Trainee II." Ex. 136. The City subsequently issued the requisite memoranda. *See* Ex. D, E, TTT.

Under the Agreement, the City also had to hold an Operations Technician I position until Ms. Garcia took the test for the position. Ex. 136. The Agreement then described the hands-on test Ms. Garcia would perform. *Id.* Although the Agreement was silent as to an additional written test, leading up to March 28, 2012, Ms. Garcia discussed with her supervisors when and how she would take two tests – the hands-on test and the written test. *See* Ex. BBBB; Ex. DDDD. Under the CBA, Job Descriptions, and City policies, Ms. Garcia was required to take and pass a written test prior to being eligible for promotion to the Operations Technician I position. *See* Ex. B at

000027; Ex. K at 000097, 000511. Under the CBA, the Union could have reviewed the written test to ensure it was fair, but the Union did not do so. Trial Tr. 25:11-26:6.

On February 29, 2012, Ms. Garcia selected April 3, 2012, as the date she would take the written test. *See* Ex. DDDD. Ms. Garcia informed Mr. Fitzgerald regarding the dates she selected for both her written and hands-on tests. Ex. FFFF. The parties to the Agreement did not negotiate the written test, because Ms. Garcia had no concerns about taking it, but she did have concerns about the hands-on test, particularly the cold startup of the Animas plant, and sought more time to observe or participate in startups beforehand. *See* Trial Tr. 74:7-18, 216:6-20, 730:16-731:9. Ms. Garcia knew when she entered the Agreement that, to be eligible for the Technician I promotion, she had to pass the written test in addition to the hands-on test described in the Agreement. *See id.* 723:1-725:22, 730:16-731:4; Ex. B. All parties to the Agreement knew she had to pass the written test for promotion, and they did not intend the Agreement to have any impact on the written test requirement. *See* Trial Tr. 74:7-18, 723:1-725:22, 730:16-731:9; Ex. B. Indeed, Ms. Garcia took the written test on April 3, 2012 without protest. Trial Tr. 730:16-731:4, 779:20-25, Ex. GGGG.

At the time she took the written test, Ms. Garcia had three years of experience at the City. Trial Tr. 779:20-25. Before completing her three years as a Trainee I and II, Ms. Garcia did not have three years of combined cycle or gas turbine experience. *See id.* 728:10-730:15. Ms. Garcia admitted that the City's job descriptions were binding on union members; that if the City advanced her to a Technician I prior to her reaching those three years of combined cycle experience, the City would have violated the CBA; and if the City had advanced another employee prior to having three years of combined cycle experience, she would have grieved that as bargaining outside the contract. *See id.* 726:14-730:15.

25

On April 5, 2012, the City informed Ms. Garcia by letter that she had failed the written test; she could not re-test for six months; the City would not administer the hands-on test until she passed the written test; but that she could participate in start-ups. Ex. 92. Pursuant to the FEUS March 2011 testing policy, she was not permitted to re-take the written test until six months later. Ex. 65.

Ms. Garcia had a score of 93 out of 150 questions correct, a 62% score. Trial Tr. 1039:17-25; Ex. 160. Ms. Garcia reviewed the test with Tom Swenk, the City's Senior HR Business Partner, and pointed out that there were improper questions. *See* Trial Tr. 717:2-23; Ex. GGGG. The testing company determined that eight of the questions were either worded differently than what was presented in the training material or, in two cases, did not contain a correct answer. *See* Ex. 160. Ms. Garcia filed a grievance contending that she passed the test and that it was a promotional test, requiring a lower score. *See id.*; Trial Tr. 717:24-718:13.

The City examined a number of scenarios, including (i) considering the 62% original score; (ii) removing all eight questions from the test, resulting in 91 correct out of 142 possible and a 64% score; (iii) giving Ms. Garcia credit for two correct answers and removing the other six questions, so 93 correct out of 144 and a 65% score; or (iv) giving her credit for all incorrect questions, 99/150 correct and a 66% score. Ex. 160. The City denied the grievance, concluding that the test was a training program test, requiring a 70% score, not a promotional test used for employees vying for and in competition with other employees for a higher position. *See id.* The City determined that Ms. Garcia failed to score a 70% under all scenarios considered. *See id.*

The Promotional Testing provision did not apply regarding Ms. Garcia's application to the Technician I position, because at the time she tested for the position, it was not competitive. *See* Trial Tr. 204:17-205:14. For the same reason, she was not entitled to seniority points. *See id.*

The City subsequently applied the 70% pass score to Damon Ben when he attempted to show successful completion of the FEUS training program. *See* Trial Tr. 206:18-21, 209:16-210:1; Ex. PPPP. The City terminated his employment when, on the second try, he only scored a 65% on the written test. Trial Tr. 206:18-21; Ex. PPPP.

Subsequently, Ms. Garcia had the opportunity to observe or participate in a number of startups and shutdowns. *See* Ex. F-H, KKK. Ms. Garcia received her Annual Evaluation for the period April 2, 2011 through April 1, 2012, on April 11, 2012, receiving "satisfactory" ratings in all categories. Ex. 152.

By on or about November 29, 2012, Plaintiff passed both the written and hands-on tests, and the City promoted her, effective October 2, 2012, to Technician I. *See id.* 293:18-294:5; Ex. R and U. Her pay was retroactive to the date on which she passed the written test. Trial Tr. 780:1-3.

Co-worker advancement

Emmanuel John worked for the City under the training program initiated prior to the changes to the new CBA and the one-person operations. *See* Trial Tr. 335:15-336:6. He was hired as a Utility I in December 2006. *Id.* 851:14-25. The City accelerated his promotion to Technician I in September 2009, earlier than what the new policy allowed, because it considered his promotion outside the boundaries of the new policy. *See id.* 335:15-336:6. Ms. Garcia was the first operator trainee who entered the new program. *Id.*

The City posted the Technician I position four times between 2010 and 2012. *See* Trial Tr. 939:21-944:3. The primary qualification for a Technician I was three years of combined-cycle, co-generation, or equivalent experience. *Id.* 939:21-940:8. Of 416 total applicants, 363 were male and 43 female. *Id.* 943:18-944:11. Thirty-three applicants had experience only at

APS, and of those applicants, 29 were male and the other four applications were those of Ms. Garcia. *Id.* 944:12-21. The City did not interview or hire any of the 33 applicants with only APS experience. *Id.* 945:20-946:3. The City also did not interview or hire any of the 14 applicants, 12 of whom were male, whose only experience was at PNM, another coal-fired power plant. *Id.* 946:4-18. One male applicant had two years, seven months combined cycle experience, but he was not interviewed or hired. *Id.* 947:19-948:15. The City interviewed eight people for the position and hired four: Karen Reyes and three males. *Id.* 947:10-16. Ms. Reyes had previously worked for 19 years at El Paso Electric, a conventional and combined cycle plant, and had three to four years of experience as a combined cycle plant operator. *See id.* 157:19-159:14.

The City hired Bryan Johnson in March 2012 as an Operations Technician I. *Id.* 373:5-9. Although Mr. Johnson did not have three years of combined cycle experience in a power plant when the City hired him, he had seven years of experience working at a natural gas plant, a utility, which involved a gas turbine, controlling pressure, creating electricity with the gas turbine to operate the gas processing plant, and separating raw gas into its constituent components at different boiling points. *See id.* 374:5-386:8.

Recordings

During her employment, beginning in 2011, Plaintiff made multiple recordings of her interactions with co-workers and supervisors and transcribed some of them. *See id.* 812:22-813:15, 816:3-818:14. She produced in discovery five recordings and 10 transcripts for which she did not produce a corresponding recording. *See* Def.'s Renewed Mot. 2, 6-7, ECF No. 156. Ms. Garcia deleted multiple recordings without disclosing them to Defendant. *See id.* 814:11-815:9, 816:17-828:4. The Court infers that the multiple recordings she deleted did not capture unfair and discriminatory treatment of her, and that, at the time Ms. Garcia made those

recordings, her co-workers were not treating her poorly during the recording period. The Court, however, does not infer that Ms. Garcia was not subject to a hostile work environment. The Court finds Ms. Garcia and Mr. Blair were credible and were consistent in their testimony that Mr. Ahkeah and Mr. Click treated her with hostility based on her gender, as described *supra*. Ms. Reyes was also credible, and her testimony corroborated the ongoing, pervasively hostile, disparate treatment Ms. Garcia received.

## Conclusions of Law

The Court has jurisdiction over the parties and subject matter, and venue is proper in the District of New Mexico.

### Count I: Failure to Promote

#### A.  Ms. Garcia did not exhaust her failure to promote claims

The Tenth Circuit "liberally construe[s] charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007). "[E]ach discrete incident" of alleged discrimination or retaliation "constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. Oct. 28, 2003) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-13 (2002)). Failure to promote is a discrete act, each of which had to be exhausted. *See Morgan*, 536 U.S. at 114; *Marquez v. Johnson*, 545 F. App'x 735, 738 (10th Cir. Oct. 18, 2013) (and cases cited therein) (rejecting plaintiff's argument that she did not need to exhaust each instance of a failure to promote). The limitations period begins on the date the employee is notified of an adverse employment decision by the employer. *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 628 (10th Cir. 2012).

Ms. Garcia did not learn that her applications for promotion had been rejected until after she filed her EEOC charge on December 14, 2010. Although she first applied for the Technician I position on December 10, 2010, the City did not notify her of the rejection until January 3, 2011. Ms. Garcia did not file any subsequent EEOC charges following the accrual of her failure to promote claims. Consequently, Plaintiff did not exhaust each of the discrete acts of failing to promote her. *Cf. Marquez v. Johnson*, 545 F. App'x 735, 738 (10th Cir. 2013) (holding plaintiff's failure-to-promote claim accrued when plaintiff became aware that she was not promoted). Accordingly, this Court is without jurisdiction to hear Plaintiff's failure to promote claims.

### B.  Ms. Garcia has not proven that the City failed to promote her because of her gender

In the alternative, the City did not discriminate against Ms. Garcia because of her gender in violation of Title VII by failing to promote her. "Title VII of the Civil Rights Act of 1964 prohibits . . . unlawful employment discrimination on the basis of an individual's sex." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000) (citing 42 U.S.C. § 2000e–2)).

According to the CBA and City policy, Plaintiff was not eligible for promotion into the Trainee II position until she had two years of experience as a Trainee I. The City did not promise Plaintiff when she was hired that it would expedite her promotion. Moreover, any oral representations made by Mr. Sims at her interview were not sufficiently specific to override the clear, unambiguous language in the CBA. There was no meeting of the minds or reasonable expectations by Ms. Garcia that she could be promoted to a Trainee II before she had worked for the City as a Trainee I for two years. Similarly, any reliance Ms. Garcia placed on the September 25, 2008 memorandum to expect advanced promotion prior to the two- and three-year respective

experience requirements was unreasonable, because the City policy, CBA, and Job Descriptions were consistent in requiring the respective two- and three-years of hands-on experience.

Ms. Garcia's subjective belief that she was qualified for the Trainee II position prior to working as a Trainee I for two years with the City was unreasonable. The City's decision to require two years of experience as a Trainee I or prior experience in combined cycle or co-generation facility was within the City's exercise of its discretion. The qualifications were not made particular to Ms. Garcia, but were instead necessary in the switch to one-person operations for safety purposes and for efficient operation of the plants. The City had objective, non-discriminatory reasons for concluding that Ms. Garcia's experience at the coal-fired APS plant was not sufficiently similar or equivalent to the more complicated operations of the City's combined cycle plant. Consequently, the City had legitimate, non-discriminatory reasons for failing to promote Plaintiff into a Trainee II position until April 2011, her two-year anniversary date with the City, and did not discriminate against Plaintiff on the basis of her sex in not offering the advancement test or promoting her until that time.

The City also had legitimate, non-discriminatory reasons for not offering the advancement test and for failing to promote Plaintiff into the Technician I position until she had three years of experience as a trainee working for the City. Given the complicated operations and knowledge required to operate the combined cycle City plants with a one-person crew, it was reasonable for the City not to consider Ms. Garcia's prior experience with APS in determining that she had not yet met the requirement of three years of combined cycle or co-generation, or its equivalent, experience until she reached her three-year anniversary date with the City. The City's reasons were not pretextual and were consistent with the CBA and City policy.

The City scheduled Ms. Garcia's written and hands-on tests for promotion to Technician

I around her three-year anniversary date in April 2012, in accordance with the CBA and City policy. The City had reasonable, non-discriminatory reasons to believe Ms. Garcia failed the written test. The City's decision to wait for six months before permitting Ms. Garcia to re-take the written exam was in accordance with the City's gender-neutral policy and was made for legitimate, non-discriminatory reasons. The City promoted Ms. Garcia into the Operations Technician I position in November 2012 when she first satisfied the legitimate, reasonable, and non-discriminatory requirements for the position: she had been employed as a Trainee for three years (and thus had three years of combined cycle, co-generation, or its equivalent, experience), had passed the written test, and had passed the hands-on test. Consequently, Ms. Garcia has not met her burden of proving that she applied for a position for which she was qualified at the time she filed her EEOC Charge.

Ms. Garcia also failed to show that similarly situated male employees were treated better or differently from her in regard to written testing opportunities and promotion. Ms. Garcia did not show that either Mr. John or Mr. Johnson were similarly situated to her, because Mr. John was hired prior to the change to one-person crews and Mr. Johnson's prior gas turbine experience at the natural gas plant was more complicated than, and involved more processes similar to, the work done at the City's plants. The City thus had a non-discriminatory reason to consider his prior work experience as equivalent, and not Ms. Garcia's, when determining that he was qualified for the Technician I position. Ms. Garcia has not demonstrated that the City treated her less favorably than Mr. John or Mr. Johnson because of her gender.

Moreover, there is no evidence that the applicants the City hired to the Technician I position lacked the qualification of three years of relevant experience in a combined cycle, co-generation, or equivalent plant. The City treated other male applicants with only APS experience

or PNM experience the same as Ms. Garcia. The City's determination that only persons with three years of experience in combined cycle or co-generation were qualified for the Technician 1 position was a reasonable business decision, not based on gender, and applied equally to males and females.

Ms. Garcia has failed to meet her burden to show she was as or more qualified than any successful applicant for the positions to which she applied, much less establish the type of differences in qualifications required to show pretext. Ms. Garcia has not met her burden of proving that she was rejected for any position under circumstances which give rise to an inference of unlawful discrimination or that her gender was a determinative, or even motivating, factor in the City's reasons for not promoting her prior to the respective April 2011 and November 2012 promotion dates.

Accordingly, the City did not intentionally discriminate against her because of her gender in not offering the advancement test or promoting her into the Trainee II position until April 2011. Nor did the City intentionally discriminate against her because of her gender in not offering the advancement test or promoting her into the Operations Technician I position until November 2012. *Cf. Mitchell v. City and County of Denver*, 112 F. App'x. 662, 669-70 (10th Cir. 2004) (noting that employee had failed to establish that he was qualified for position because employer required a minimum of years of service that the employee did not have). Ms. Garcia is not entitled to any compensatory damages on her failure-to-promote claim. Defendant is therefore entitled to judgment in its favor on Count I.

### Count II:     Hostile Work Environment

The Settlement Agreement does not bar Ms. Garcia from bringing her hostile work environment claim in this Court. The language of the Agreement that "No presently pending

grievances (other than this one) are hereby resolved" limits the meaning of the "clean slate" provision to resolving only Ms. Garcia's September 17, 2010 union grievance. As evident by the language contained in the Agreement, and the lack of express language regarding the resolution of her Title VII claims, the parties did not mutually understand, have a meeting of the minds, intend, or agree that the Agreement would operate to bar Ms. Garcia from pursuing her Title VII gender discrimination claims, and she did not violate the terms of the Agreement by continuing to pursue her Title VII claims administratively and before this Court.

"An employee who is sexually harassed by a supervisor may have a claim against the employer under Title VII of the Civil Rights Act." *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 650 (10th Cir. 2013). For a plaintiff to prevail on a Title VII gender-based hostile work environment claim, she must show that she was discriminated against because of her gender and "that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Morris v. City of Colorado Springs*, 666 F.3d 654, 663 (10th Cir. 2012) (quoting *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005)). A plaintiff must show that the work environment was both objectively and subjectively hostile and abusive. *Id*. at 664. To establish that an employer is directly liable for a hostile work environment, the plaintiff must present enough evidence for the trier of fact "to find that the employer knew or should have known about the harassment but failed to stop it," in other words "that the employer was negligent in failing to stop harassment." *Debord*, 737 F.3d at 650. To avoid vicarious liable for harassment committed by a supervisor against an employee, an employer must demonstrate the elements of "the *Faragher* defense—by showing both that the employer 'exercised reasonable care to avoid harassment and to eliminate it when it might occur,' and that the complaining employee 'failed

to act with like reasonable care to take advantage of the employer's safeguards.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998)).

Ms. Garcia belongs to a protected class, female, under the provisions of Title VII, 42 U.S.C. § 2000e, *et seq.*

Plaintiff met her burden to show that Mr. Ahkeah's and Mr. Click's hostile, severe, and pervasive conduct towards her was because of her gender. Ms. Garcia spent considerable time from the date of her hiring to the date of her filing the Charge of Discrimination under the supervision of Mr. Ahkeah and Mr. Click, both of whom assigned her disparate cleaning assignments because of her gender. Mr. Ahkeah regularly belittled, demeaned, and humiliated Ms. Garcia, in a sufficiently severe, frequent, and pervasive manner as to alter the conditions of her employment and create an abusive working environment because of her gender. Mr. Ahkeah treated Ms. Garcia differently from Mr. Ben, the male trainee who was similarly situated to her, because she was female, in the manner of giving her more cleaning and other menial assignments, not allowing her in the control room with the same frequency, refusing to offer her the same training opportunities, and subjecting her to frequent humiliating, demeaning comments, threats, and isolation. The demeaning comments "bitch," "our little secretary," and "typist," when considered with assigning her disparate cleaning assignments, were gender-based. This evidence indicates that Mr. Ahkeah and Mr. Click made other belittling comments, such as calling her "stupid" and "slow," because of her gender. Mr. Click also disparately assigned Ms. Garcia cleaning tasks and demeaned her because of her gender in a sufficiently severe, frequent, and pervasive manner as to alter the conditions of her employment and create an abusive working environment. Although other trainees and operators performed cleaning tasks, Ms. Garcia's superiors disproportionately assigned her cleaning assignments and other menial tasks

at a higher frequency than similarly situated male employees.

The Court concludes, based on the totality of the circumstances, that Ms. Garcia was offended by the abusive work environment and that a reasonable person would likewise be offended and would consider the work environment to be severe, pervasive, hostile, and abusive. Ms. Garcia has met her burden to show that she was discriminated against because of her gender and that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment in violation of Title VII.

The hostile treatment to which Mr. Ahkeah and Mr. Click subject Ms. Garcia was similar in character, frequency, and timing, and comprised the same hostile environment. Both Mr. Ahkeah and Mr. Click committed more than one act of harassment during the time period from April 1, 2009 to October 20, 2010, the dates Ms. Garcia set forth in her EEOC Charge. Their hostile conduct both before and after the December 14, 2010 EEOC Charge was similar in character, frequency, and timing, and comprised the same hostile environment. Plaintiff therefore exhausted her administrative remedies with respect to her hostile work environment claim. This Court has jurisdiction, under a continuing violation theory, to consider the entire scope of Ms. Garcia's hostile work environment claim that began in April 2009 and continued after the December 14, 2010 EEOC Charge. *See Morgan*, 536 U.S. at 105, 120.

Ms. Garcia reported to the City on numerous of occasions that she was being subjected to a gender-based, severe, and pervasively hostile work environment. Ms. Garcia thus acted with reasonable care to take advantage of the City's safeguards. The City knew of the pervasively disparate and hostile treatment of Ms. Garcia and did not properly investigate, address, and remedy the hostile work environment to which Ms. Garcia was subject. Despite the reports to her

36

supervisors, the City failed to act appropriately or with reasonable care to remedy and resolve the hostile work environment. The City's response to Ms. Garcia's complaints was negligent and was not reasonable. The investigations failed to reasonably consider the claims of Ms. Garcia; ignored the substance of her allegations; ignored the corroborating evidence given by co-workers, particularly from Mr. Blair and Mr. Taylor, who had no reason to lie for Ms. Garcia; covered up information that should have been further investigated; diminished the scope of Ms. Garcia's claims; and made unreasonable credibility determinations. The City conducted biased, unfair, and negligent investigations into Ms. Garcia's claims of discrimination, harassment, and hostile work environment.

The City never sufficiently disciplined Mr. Ahkeah or Mr. Click in a manner that was intended to alter their conduct. Instead, the City permitted Mr. Ahkeah and Mr. Click to continue to supervise her, in effect, ratifying their hostile treatment of her. The hostile work environment did not change and worsened.

Accordingly, the City knew about the harassment but failed to stop it. The City was negligent in failing to stop the harassment. The City did not exercise reasonable care to avoid the harassment or to eliminate it when it might occur.

The City's actions and negligence caused Ms. Garcia emotional pain, mental anguish, and loss of enjoyment of life by subjecting her to sex-based, severe, pervasive, demeaning, and hostile treatment. Plaintiff is entitled to $20,000.00 in damages to fairly and reasonably compensate her for the emotional pain, mental anguish, and loss of enjoyment of life that the City's violation of Title VII caused her. *See* 42 U.S.C. § 1981a(b)(3) (providing that, under Title VII, a victim of intentional discrimination can recover damages for "emotional pain, ... mental anguish, loss of enjoyment of life, and other nonpecuniary losses....").

Ms. Garcia, however, failed to establish that she lost any wages as a result of the hostile work environment, and the Court will not award any damages for back-pay.

In exercising its sound discretion to determine whether to award prejudgment interest, a trial court must consider (1) whether an award of prejudgment interest would serve to compensate the injured party; and if so, (2) whether the equities would preclude the award of prejudgment interest. *Caldwell Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1286 (10th Cir. 2002). "As a general rule, district courts 'should calculate interest on back pay and past damages based on the date of the adverse employment action.'" *Reed v. Mineta*, 438 F.3d 1063, 1066 (10th Cir. 2006) (quoting *Thomas v. Texas Dep't of Crim. Justice*, 297 F.3d 361, 372 (5th Cir. 2002)). Prejudgment interest, however, does not accrue until the victim actually sustains monetary injury. *Id.* at 1066.  Plaintiff's emotional distress, and resulting damages, started when the first incident of harassment occurred and continued thereafter throughout her employment. Despite the general rule, the Court concludes that Ms. Garcia is not entitled to the payment of prejudgment interest in addition to her award of emotional distress damages, because the amount the Court awarded in compensatory damages was designed to make Ms. Garcia whole, and a further award of prejudgment interest would be unnecessary and would over-compensate Ms. Garcia for the emotional distress that resulted from her hostile work environment. *Cf. Barnett v. Board of County Commissioners of County of Montrose*, 2015 WL 5315183, at *2 (D. Colo. Sept. 11, 2015) (declining to award prejudgment interest on compensatory damages because it would duplicate damages already permitted); *E.E.O.C. v. Everdry Marketing and Management, Inc.*, 556 F.Supp.2d 213, 223-24 (W.D.N.Y. 2008) (denying EEOC's motion to amend judgment to include award of prejudgment interest as to compensatory damages for emotional distress because jury's award for compensatory damages account for ongoing injuries or suffering found

to result from defendants' conduct, amounts awarded were designed to make claimants whole, and prejudgment interest would represent windfall).

Ms. Garcia is entitled to payment of post-judgment interest on her Title VII hostile work environment claim. *See* 28 U.S.C. § 1961. Interest shall accrue on the entire award from and after the entry of judgment at the federal judgment rate.

Ms. Garcia is entitled to her reasonable attorney's fees and costs on her Title VII hostile work environment claim. *See* 42 U.S.C. § 2000e-5(k).

Plaintiff is therefore entitled to judgment in her favor and against Defendant in the amount of $20,000.00 in damages, plus payment of post-judgment interest and attorney's fees and costs, on her Title VII hostile work environment claim in Count II.

**Count VI:      Breach of Settlement Agreement**

The Settlement Agreement did not contain any term related to written testing. The City complied with the terms of the CBA by requiring that Plaintiff pass a written test for qualification/training for the Technician I position. The City's act of requiring Ms. Garcia to take a written test did not breach the Settlement Agreement.

To the extent the Settlement Agreement's silence on the written testing requirement could be construed as inconsistent with the CBA, the doctrine of merger applies. "The doctrine of merger is a contract principle that prior agreements on the same subject matter are presumed to be included in the final contract." *Superior Concrete Pumping, Inc. v. David Montoya Const., Inc.*, 1989-NMSC-023, ¶ 13, 108 N.M. 401. "Merger applies only to successive agreements that encompass the same subject matter and contain inconsistent terms." *Id.* "Generally, one contract will not merge into the other unless it is plainly shown such was the intent of the parties." *Id.* The CBA encompassed the same subject matter as the Settlement Agreement regarding the necessary

steps for promotion into Operations Technician I. The Union, Ms. Garcia, and the City all understood and intended that Ms. Garcia would take, and be required to pass, a written test for advancement to Operations Technician I, as required by the CBA and the Job Descriptions. Ms. Garcia and the City are bound by the terms of the CBA. In executing the Settlement Agreement, which was pursuant to a grievance brought under the terms of the CBA, the parties understood that the CBA was related to, part of, or subsumed the Settlement Agreement. The CBA prohibited the parties from altering its terms by means of the Settlement Agreement. The terms of the Settlement Agreement did not supersede the terms of the CBA. The CBA merged into the Settlement Agreement; therefore, The CBA's written test requirement for promotion into the Operations Technician I position was included in the Settlement Agreement, and the City did not breach the Agreement by requiring Ms. Garcia to pass the written test.

The City also reasonably concluded that Ms. Garcia failed the April 3, 2012 written test. Because Ms. Garcia did not get the requisite 70% score on the written test under any of the scenarios the City considered to account for the eight improper questions, the City did not violate the Settlement Agreement by determining that she had not passed the written test and by requiring her to take a second written test six months later, in accordance with the Training Program Testing policy. *See* Ex. XXX. It was reasonable for the City to follow its policy of not conducting the hands-on test until the employee passed the written test. *See* Ex. GGGG. The City did not breach the Settlement Agreement by requiring her to re-take the test in six months before providing the hands-on test.

In the alternative, the parties modified the Settlement Agreement through their oral communications, conduct, and course of dealing to include a requirement that Ms. Garcia take a written test for partial qualification for the Technician I position. *See Wal-Go Assoc. v. Leon*,

1981-NMSC-022, ¶ 11, 95 N.M. 565 (contract may be modified through oral agreement or course of dealing). Ms. Garcia scheduled the written test, informed the Union she had done so, and took the written test. Neither she nor the Union protested the fact of her taking the test. Alternatively, Plaintiff waived the alleged violation of the Settlement Agreement by her statements and conduct – selecting a date to take the test, taking the test, and never protesting the fact that the test was required. *See Talley v. Security Service Corp.*, 1983-NMSC-046, ¶ 18, 99 N.M. 702 (waiver is voluntary relinquishment of some known, existing right and an intention to relinquish or surrender it).

The City complied with its obligations under the Settlement Agreement by providing Ms. Garcia with additional hands-on experience with startups and shutdowns, distributing the memoranda required by the Agreement, and making an Operations Technician I position available to her as soon as she completed all requirements for that position. Defendant is therefore entitled to judgment in its favor on Count VI.


_____
**UNITED STATES DISTRICT JUDGE**